OPINION OF THE COURT
David B. Saxe, J.
The issue that I am asked to decide here is whether a man *541 who marries with the express understanding that he will do all in his power to sire children with his wife, and then refuses to fulfill that promise, has acted so egregiously as to affect the manner in which the couple’s assets are distributed upon their divorce.
At the outset of the trial of this matrimonial action, the defendant wife took the position that the conduct of the plaintiff husband during the marriage constituted egregious marital fault, which should be reflected in the distribution of the marital assets. Recognizing that this position could require a long and expensive trial, it was determined that the court should consider as a threshold issue — in the context of an in limine motion — whether, assuming for this purpose alone that Mrs. McCann’s assertions were true, the conduct of the plaintiff could be considered as a factor in the court’s equitable distribution of the marital estate.
FACTS
The parties met in 1977, when Brenda McCann was 35 years old and Franklin McCann a year older. Mr. McCann, a descendant of F. W. Woolworth, was educated at Deerfield Academy and Trinity College, and is a stockbroker. He was previously employed at E.F. Hutton, Shearson Lehman, and Bear Stearns, and is currently a principal of Presidents International. Mr. McCann’s family owns a "family compound” in Pound Ridge, New York; he also maintains the marital residence, a large cooperative apartment in Manhattan, and another Manhattan apartment in which he currently resides.
Brenda McCann is also highly educated, having graduated from Vassar College, and has a prestigious and lucrative position as a securities analyst and a principal at Morgan Stanley. She maintains a residence in Water Mill, New York, purchased shortly prior to the marriage, and a residence in Sarasota, Florida. Mrs. McCann says she was raised in a conservative, traditional, Catholic home, and although she was taught that she should have a career first and a family later, she strongly believes that marriage is a lifetime commitment which should include children.
When the parties met, Mr. McCann was involved in a divorce from his first wife. While he was legally separated from his first wife, he began dating the defendant, and eventually moved into her apartment with her. Mrs. McCann says that because she was very much in love with Mr. McCann, she *542 supported him by paying the rent and most of their living expenses during that time, when he was experiencing financial difficulties. Mr. McCann disputes having experienced any such financial difficulties, and states that he paid his share of the couple’s expenses.
Mrs. McCann alleges that Mr. McCann fully understood that she would not marry him unless he agreed they would definitely have children. She claims their discussion of marriage was premised upon the plan and expectation of having children. Nevertheless, she claims, it was not until some two years into their relationship that Mr. McCann told her that he had a fertility problem, a condition called varicocele, which curtailed the chances of his siring a child. However, during his first marriage, he had undergone a surgical procedure which enabled him and his first wife to have a child, born in 1970. Mrs. McCann says she was shocked upon hearing the news of his condition, but married him anyway because she trusted him when he promised to undergo the surgery again to correct his condition. The plaintiff told her he had held this information back from her for fear of her ending their relationship. She says he frequently and repeatedly assured her that another operation would be successful and that she had nothing to fear. She was in love with the plaintiff and she believed him.
The couple became engaged in January 1980 and at that time, Mrs. McCann says, she asked Mr. McCann to undergo a sperm analysis, because she did not want to marry him with a misapprehension about his ability to have a child. Several months later, Mrs. McCann says, he told her that he had the analysis done and that his sperm count was low but could be corrected. In fact, such a test was performed in 1978, and the sperm level was characterized as in the "critically low range.”
The McCanns were married on June 28, 1980 in St. Andrews Dune Church in Southampton, an Episcopalian church attended by the socially prominent residents of that town. They selected and moved into a Manhattan cooperative apartment with three bedrooms, a maid’s room, and 4 Vz baths, which Mrs. McCann asserts was expressly chosen as roomy enough for a family. The couple traveled all over the world for business and pleasure, and joined the Southampton Beach Club and the Meadow Club.
Mrs. McCann alleges that although they discussed and agreed that Mr. McCann would undergo any procedures avail *543 able to enhance his fertility and enable the couple to conceive children, after the marriage he delayed undergoing the surgical procedure until 1984 and that even later on he failed to cooperate in attempting to conceive a child by declining to have sexual relations and by subsequently refusing to participate in artificial insemination.
On June 5, 1987, following various tests on both parties, Mrs. McCann’s physician told her that although she was almost 45 years old, she was capable of conceiving and carrying a child to full term. It had been recommended that the parties employ artificial insemination. However, she says her husband responded to her announcement with the news that he would not have a child with her, that he would only have a child with a younger woman, and that he wanted a divorce.
The parties, however, remained married and continued to both reside in the marital apartment for some time and this divorce action was not commenced until July 1989. In her answer, Mrs. McCann interposed a counterclaim for divorce as well.
Mrs. McCann now contends that Mr. McCann perpetrated a fraud upon her with his false promises.
Furthermore, Mrs. McCann believes that as of late 1986, Mr. McCann began a relationship with a much younger woman, who was about 24 years of age. The defendant is particularly outraged because, she says, Mr. McCann intends to give that younger woman the child he denied to her.
DISCUSSION
The primary question to be addressed here concerns the role fault generally plays in the equitable distribution of marital assets, particularly the distinction made in the pertinent case law between egregious and nonegregious conduct.
In 1980, the Legislature abolished a law that had automatically barred a woman from receiving alimony if she was guilty of misconduct constituting marital fault. In its place, the Legislature enacted the Equitable Distribution Law (EDL) (Domestic Relations Law § 236 [B], L 1980, ch 281, § 9), a statute that contains no reference to marital fault in its list of factors for the court to consider in equitably distributing marital property upon divorce.
In the years immediately following the enactment of the EDL, courts were divided about whether marital fault was a relevant consideration in distributing marital assets (see, 3 *544 Foster Freed & Brandes, Law and the Family New York, § 7:17, at 392 [2d ed]; see, e.g., Giannola v Giannola, 109 Misc 2d 985 [Sup Ct, Suffolk County 1981]; M.V.R. v T.M.R., 115 Misc 2d 674 [Sup Ct, NY County 1982]).
Then, in 1984, the Second Department established the now well-recognized standard for determining whether marital fault may play a role in equitable distribution (see, Blickstein v Blickstein, 99 AD2d 287 [2d Dept 1984]). The Second Department held that although "as a general rule, the marital fault of a party is not a relevant consideration under the Equitable Distribution Law in distributing marital property upon the dissolution of a marriage * * * there will be cases in which marital fault, by virtue of its extraordinary nature, becomes relevant and should be considered” (see, Blickstein v Blickstein, supra, 99 AD2d, at 292).
Having declared the possible relevance of marital fault, the Court went on to describe the "extraordinary” character and quality that such fault must possess in order to merit consideration: In a given case, fault will only be relevant where "the marital misconduct is so egregious or uncivilized as to bespeak of a blatant disregard of the marital relationship — misconduct that 'shocks the conscience’ of the court thereby compelling it to invoke its equitable power to do justice between the parties” (Blickstein v Blickstein, supra, at 292; accord, O’Brien v O’Brien, 66 NY2d 576 [1985]; McMahan v McMahan, 100 AD2d 826 [1st Dept 1984]; cf., D’Arc v D’Arc, 164 NJ Super 226, affd 175 NJ Super 598, cert denied 85 NJ 487, cert denied 451 US 971 [1981]).
What is unfortunately lacking in the Blickstein definition, however, is a standard beyond the purely subjective with which to determine whether a given act is "conscience-shocking,” and thus egregious. In other words, the Blickstein court (supra, at 292), in attempting to distinguish egregious from nonegregious behavior, responded to that question merely by substituting another — namely, the determination of which category of actions "shock the conscience” — and so left both, at least overtly, unanswered. In order to resolve the present matter and clarify the standard, however, it is helpful to examine the logical underpinnings of the Blickstein rule.
Many legal scholars who study how the meaning of words becomes established (a field called hermeneutics) have rejected the notion that qualities like ambiguity and clarity are intrinsic properties of language (cf., Michaels, Against Formalism: *545 Chickens and Rocks, reprinted in Interpreting Law and Literature, at 217 [1988]). They have determined that the meaning of words is always a function of the context in which the language is used and received. Similarly, the idea that any particular conduct is inherently harmful or benign should be rejected. Indeed, a Judge’s decision as to the the meaning of a word is inevitably based on extrinsic evidence, whether it be the so-called "common” meaning or even the Judge’s own personal experience and education (see, Corbin, The Interpretation Of Words And The Parol Evidence Rule, 50 Cornell LQ 161, 164 [1965]). Likewise, when a Judge has to decide if an act is conscience-shocking, he must look to the extrinsic evidence of normative societal perceptions of that act. Just as a word has no meaning removed from a specific context, neither will an act possess any significance beyond the external implications society places on its results.
This point has been previously implicitly understood by one court (see, Wenzel v Wenzel, 122 Misc 2d 1001, 1002 [Sup Ct, Suffolk County 1984, McCaffrey, J.]; Thompson v Thompson, NYLJ, Jan. 5, 1990, at 28, col 3 [Sup Ct, Nassau County, McCaffrey, J.]), which stated that the repugnance or violence of an act is not alone the basis upon which to consider fault as a factor in equitable distribution, and that there must also be a finding of an adverse detrimental effect. This is necessarily true since, as stated, no act in and of itself is conscience-shocking, evil, or outrageous, but is only characterized as such by society when the act in question grievously injures some highly valued social principle.
This suggested analysis, which looks to the nature of the social harm done, is analogous to a traditional understanding of the definition of criminal conduct. Generally, the physical component of a criminal act is said to contain two elements, a "voluntary” act and some resultant social harm (see, Eser, The Principle Of "Harm” In The Concept Of Crime: A Comparative Analysis Of The Criminally Protected Legal Interests, 4 Duq L Rev 345 [1966]). For the purpose of the present analysis, the concept of social harm is the more important of these two elements.
Recently, Professor Joshua Dressier, in his work, Understanding Criminal Law, has provided an especially articulate definition of social harm. Society, he has written, values and has an interest in protecting people and things. The "things” that society values and has an interest in protecting may be either tangible (e.g., personal property) or intangible (e.g., *546 emotional security, personal autonomy, morality, or privacy). Society is wronged when an actor invades or injures any socially recognized interest. Social harm, therefore, may be defined as the negation, endangerment, or destruction of an individual, group or State interest, that is deemed socially valuable (see, Dressier, Understanding Criminal Law, at 88-89 [1987]).
Similarly, with respect to the concept of egregious behavior, marital fault may also be understood as a voluntary act in the context of the marriage that causes some social harm. The difference between ordinary marital fault and egregious marital fault, however, concerns the relative importance of the particular social value involved. The more highly the preservation of an interest is valued by society, the more likely it is that the offensive conduct in question will be deemed egregious.
A Judge, therefore, in determining whether particular conduct amounts to egregious marital fault, must decide whether the social interest compromised by the offending spouse’s conduct is so fundamental that the court is compelled to punish the offending spouse by affecting the equitable distribution of the marital assets.
Indeed, although only implicitly, the Court in Blickstein (99 AD2d 287, supra), as in every other case that has subsequently adopted the Blickstein standard, has engaged in this logical methodology.
For example, the reason why the attempted murder of an innocent spouse has been found to constitute egregious marital fault is that society values the preservation of human life so highly that any conduct which offends that interest merits punishment (see, Venkursawmy v Venkursawmy, NYLJ, Mar. 16, 1990, at 22, col 5 [Sup Ct, NY County]; Valenza v Valenza, NYLJ, Jan. 16, 1990, at 31, col 4 [Sup Ct, Queens County]). Along the same line of reasoning, an unsuccessful contrivance by one spouse to make arrangements to have the other murdered has also been held as egregious (see, Brancoveanu v Brancoveanu, 145 AD2d 395 [2d Dept 1988]; Gordon v Gordon, NYLJ, Mar. 10, 1992, at 22, col 5 [Sup Ct, NY County]). Likewise, rape (see, Valenza v Valenza, supra; Thompson v Thompson, supra), kidnapping (see, Safah v Safah, NYLJ, Jan. 8, 1992, at 26, col 5 [Sup Ct, Suffolk County]), and a long history of severe physical abuse (see, Debeny v Debeny, NYLJ, Jan. 24, 1991, at 29, col 2 [Sup Ct, Nassau County]) have been *547 considered egregious, since such conduct callously imperils the value our society places on human life and the integrity of the human body.
Those cases that do not consider the societal interest in question important enough to divest the offending spouse of certain marital property have consequently not held the corresponding conduct egregious. Marital fidelity, for example, apparently falls into the realm of these "lesser” values, so adultery is nonegregious (see, Rosenberg v Rosenberg, 126 AD2d 537 [2d Dept 1987]; Wilbur v Wilbur, 116 AD2d 953 [3d Dept 1986]). Also, since abandonment, either actual (see Blickstein v Blickstein, 99 AD2d 287, supra) or constructive (see, Wilson v Wilson, 101 AD2d 536 [1st Dept 1984]), has not been considered egregious behavior, the societal preference for matrimonial cohesion is another value deemed of insufficient gravity to compel an economically punitive response against the offending spouse.
There have also been cases where, although the societal interest involved is important, the offending spouse’s particular conduct has not injured that interest to a substantial enough degree in the eyes of the court. For example, although protecting a spouse’s general physical and mental well-being is a paramount interest, it has been held that conduct which consists of alcoholism, verbal abuse, and a single act of physical violence is not sufficiently violative of that interest so that the court must affect the offending spouse through equitable distribution, even though such conduct caused the innocent spouse to suffer nervous problems requiring a physician’s care (see, Weilert v Weilert, 167 AD2d 463 [2d Dept 1990]; see also, Kellerman v Kellerman, 187 AD2d 906 [3d Dept 1992] [verbal harassment, threats and several acts of physical violence not egregious]).
Here, the conduct alleged consisted of the offending spouse’s deceitful entry into marriage based on his promise that having children was the central purpose of the marital relationship and that he would fully cooperate in all attempts to conceive, and his subsequent refusal to fulfill that promise after several years of deliberately lying, causing the innocent spouse who relied on the promise to pass the age of child bearing without having a child.
I find that this alleged conduct does, to quote the Blickstein decision (supra, at 292), "bespeak of a blatant disregard for the marital relationship.” The foundation of the marital relationship is mutual trust and the formation of a loving family.
*548 The real question, however, according to the Blickstein standard (supra, at 292), is whether the offending spouse’s conduct "shocks the conscience” — i.e., whether the social values contravened by the offending spouse’s behavior is so important that some punitive response in the context of equitable distribution is appropriate.
More than one social value is impacted by the alleged conduct in this case. First, as a society we place substantial value on the centrality of the family, which by definition includes married couples having and raising children. One spouse’s refusal to do so can be viewed, from a sociological viewpoint, as causing injury to society as a whole. Yet that social value, and its violation, clearly cannot fall within the category of those critically important values whose violations affect equitable distribution. Notwithstanding the societal value in favor of marital relations and the bearing of children within that context, society now recognizes that a married individual’s refusal to have sexual relations, for whatever reason, is fundamental; it is for this reason we recognize and prosecute the occurrence of rape by a husband against a wife. An individual’s decision, in the context of a sexual relationship, as to whether or not to engage in sexual relations and as to whether or not to actively attempt to conceive a child, is highly personal and complex, relating to the dynamics between the couple as well as other societal forces. The issue is simply not amenable to the black-and-white value system in which egregious marital fault is found.
I realize that the misconduct alleged here is more than merely a refusal to cooperate in conceiving a child. It is that the husband lied outright when he declared his intentions toward his fianceé, since he allegedly never intended to have a child with her. A married person may seek the dissolution of the marriage on grounds that the other refuses to engage in sexual relations (see, Domestic Relations Law § 170 [2]; Diemer v Diemer, 8 NY2d 206 [I960]), and marriages may be annulled on grounds of fraud when the fraud consists of express, willful misrepresentations as to an intention to bear children as long as the innocent spouse ceases cohabitation once she obtains full knowledge of the facts constituting the fraud (see, Domestic Relations Law § 140 [e]; Rich v Rich, 40 AD2d 846 [2d Dept 1972]). However, I cannot hold that such a misrepresentation, even though it goes to the heart of the relationship, is more socially deleterious than alcoholism, adultery, abandonment, and verbal or physical abuse, all of which have already been *549 rejected as “egregious marital fault”. I further note that here, although I cannot make factual findings at this point, Mrs. McCann may in fact have even condoned his behavior, given the amount of time she stayed with him after learning that his professed intent to have children with her was untrue.
I further acknowledge the depth of pain and injury which Mrs. McCann feels. However, if the misconduct does not violate the type of critical, central value discussed above, the severity of the resultant psychological harm cannot render conduct which would otherwise be considered nonegregious under Blickstein (supra) to be egregious.
Therefore, although the alleged conduct in this case is certainly morally reprehensible, in view of the controlling prior decisions that strictly delineate the specific parameters of conscience-shocking behavior, I rule that there is no egregious marital fault here.