[751 NYS2d 449]

TheresA HavelL, Respondent, v Aftab Islam, Appellant.

First Department, December 12, 2002

## APPEARANCES OF COUNSEL

*Ellen Gesmer* of counsel (*Kristin Bebelaar* on the brief; *Gulielmetti & Gesmer, P.C.,* attorneys), for respondent.

*Louis I. Newman* of counsel (*Slade & Newman, LLP,* attorneys), for appellant.

*Elizabeth A. Adinolfi* of counsel (*Jennifer Ferrante* on the brief; *Laura Russell,* attorney), amicus curiae.

## OPINION OF THE COURT

WILLIAMS, P.J.

Plaintiff wife commenced this divorce action in May 1999. The facts elicited at trial show that the parties had been married for 21 years and parented six children, four of whom are minors. Both hold Bachelor of Arts and Master of Arts degrees; the husband from Cambridge University in England, the wife from Manhattanville College and New York University, respectively.

The couple met while working at Citibank, the wife from 1970-1978, the husband from 1970-1988. At the time of their marriage, he was earning $45,000 a year and she was earning $40,000 a year at Lehman Brothers in the international banking and securities trading group. The wife left Lehman Brothers in late 1983, at which time she was earning $150,000-175,000 a year; at the time, the husband was earning about the same. The husband's annual income at Citibank peaked at $300,000-350,000 before his position was eliminated in 1988. He received a salary of $110,000 from Citibank until 1990 and was unemployed thereafter. Subsequently, the wife was the family's sole economic support.

After leaving Lehman Brothers, the wife took a position in 1984 with Neuberger Berman in order to launch a fixed income department. Her starting salary was $150,000 plus a percentage of fees of assets managed. In four years, she was earning over $1 million per year. In 1996, she was released from Neuberger and received a compensation package of $6,841,427 plus a refund of her investment which exceeded $500,000. She proceeded to start her own company, Havell Capital Management, specializing in the management of fixed income assets. By the time of trial, December 2000, her company had approximately $250 million of assets under management, she

was a 50.5% owner receiving a draw of $320,000 per year and an estimated income of $879,167.

In the course of the marriage, the couple acquired valuable real estate, including a brownstone on East 78th Street in Manhattan, a country home in Sandisfield, Massachusetts and a second country home in North Salem, New York. The family took several vacations a year and entertained at the brownstone and the North Salem home.

Meanwhile, despite plaintiff wife's alleged encouragement, defendant declined to seek any business opportunities and instead gardened, read and attempted several writing projects. He claimed to be engaged in running the household and child-rearing. Throughout the marriage, defendant was verbally and/or physically abusive to plaintiff and his children on numerous occasions.

On April 15, 1999, plaintiff advised defendant that she would seek a divorce. Several days later, on April 21, 1999, he broke the locks on the door to her bedroom, where she slept separately from him. On April 22, 1999, their daughter Chloe's birthday, he set his alarm clock to waken him at 4:00 A.M. and entered his wife's bedroom at approximately 5:00 A.M. The wife awoke to the sight of him entering her bedroom, taking a seat in a chair at the foot of her bed, and wearing yellow rubber gloves and carrying a barbell. When she sat up, he went over, pinned the wife to the bed with his knee and began beating her viciously on the head, face, neck and hands with the barbell. Plaintiff, who was conscious during the incident, observed her blood, teeth and bone spattering everywhere. Her screams brought their three young daughters, Chloe, Clarissa and Georgina, aged 15, 12 and 10 respectively, into the room where defendant told Chloe that he had killed her mother. As Chloe tried to call 911 for assistance, defendant twice attempted to renew his attack on plaintiff, first with a long piece of pipe and then with a large towel over her face. The daughters held him off her until the police arrived and arrested defendant.

Plaintiff's injuries were severe. She suffered, among other things, multiple contusions, a broken nose and jaw, broken teeth, multiple lacerations, and neurological damage. Her medical treatment included the surgical installation of a titanium plate over her eye, over 20 hours of painful dental procedures, and many other oral and facial surgical procedures over the next several months. Afterwards, she has suffered pain, dizziness, headaches, nightmares, sleeplessness and post-traumatic stress syndrome. Despite these problems plus hor-

rible bruises and scarring, plaintiff was back at work on a part-time basis three weeks after the attack.

Defendant was indicted for attempted murder, pleaded guilty to assault in the first degree on August 11, 2000 and was sentenced subsequently to $8^{1}/_{4}$ years in prison. Prior to that, on August 13, 1999, defendant was held in contempt by Justice Silbermann for entering the North Salem residence in violation of orders of protection. He pleaded guilty to that charge on December 7, 2000 and was sentenced to a 30-day jail term to run concurrently with the sentence in the assault case.

Plaintiff wife commenced this divorce action in May 1999. In a pendente lite order dated June 17, 1999, the court granted her motion for distribution of 100% of the proceeds from the sale of the East 78th Street residence to the extent of ordering that all but $150,000 of the expected proceeds, $3.9 million, be retained by the wife to purchase a new residence and for ordinary living expenses. The $150,000 was awarded to the unemployed husband for his living expenses. This Court affirmed that order (*Havell v Islam*, 273 AD2d 164). Prior to trial, the husband was awarded additional monies from that sale to bring his total award to $377,500. This additional award was also affirmed by this Court (*Havell v Islam*, 288 AD2d 160).

The net value of the marital assets is not in question, as the parties are in substantial agreement that it is in the area of $13 million. The assets may be categorized as follows:

Real estate—the East 78th Street brownstone sold for $3,649,510; the Massachusetts home sold for $488,991; and the North Salem property was valued by the trial court at $8,000,000 less the mortgage of $768,000;

Cash and securities—the court valued the three marital bank accounts at $15,000, $95,000 and $55,000 and a nonmarketable securities account at $1,115,562;

Pension and retirement—the court valued the wife's three accounts at $525,154, $295,643 and $48,720, the husband's two accounts at $550,000 and $142,000;

Jewelry—the court valued the wife's jewelry at $123,000, relying on her insurance affidavit and rejecting her assertion that it was only worth $20,000;

Home furnishings—the court valued the contents of the parties' homes at $2,748,848;

Separate property—the court found that the increase in value in the wife's retirement accounts was the result of her

active management and thus her separate property in the amounts of $206,952 and $67,916; the court found that the increase in value in the husband's IRA was the result of his active management since this action commenced, and thus any increase over $550,000 was his separate property.

The court's decision after trial granted plaintiff a divorce, denied defendant counsel fees and equitable distribution beyond the pendente lite award, and distributed all other marital assets to plaintiff. With reference to equitable distribution, the court examined each of the 13 factors cited in Domestic Relations Law § 236 (B) (5) (d). It noted with reference to factor number two, "the duration of the marriage and the age and health of both parties" (cl [2]), that plaintiff wife's health was poor due to defendant's assault; with reference to factor number six, "any equitable claim to, interest in, or direct or indirect contribution made to the acquisition of such marital property by the party not having title, including joint efforts or expenditures and contributions and services as a spouse, parent, wage earner and homemaker, and to the career or career potential of the other party" (cl [6]), that plaintiff had made a far larger financial contribution to the family whereas the husband had assisted only minimally with child-rearing and managing the household. With regard to factor number thirteen, "any other factor which the court shall expressly find to be just and proper" (cl [13]) the court found that the evidence required that it consider the issue of marital fault including the domestic violence occurring both prior to and on April 22, 1999.

The court held that defendant's vicious assault on plaintiff was so egregious as to "shock the conscience" and relied on its equitable powers to render justice between the parties. It specifically rejected defendant's contention that a spouse's egregious conduct should not be considered as a factor in equitable distribution unless the behavior had some economic impact. The court denied defendant counsel fees, reasoning that under the circumstances, it would be inequitable to require plaintiff to pay them. The court also declined to award defendant a setoff, in the amount of the marital property denied him, against plaintiff's potential judgment in her personal injury action against him.

The several questions raised on this appeal include: whether or not the trial court erred in holding that defendant's attempted murder of plaintiff was a valid consideration here in awarding plaintiff over 95% of the marital estate upon equit-

able distribution, a matter of first impression before this Court; whether or not the trial court gave proper weight to the other statutory factors in rendering its determination as to equitable distribution; whether or not it was proper for the trial court to conclude that defendant's attack on plaintiff was an attempted homicide rather than the first-degree assault to which he pleaded guilty; whether or not, under the circumstances, the trial court properly denied defendant an award of attorneys' fees; and, whether or not the trial court properly denied defendant a setoff, in the amount of his purported "equitable share," against plaintiff's potential judgment in her personal injury action against him.

The general rule in New York is that marital fault should not be considered in determining equitable distribution (Scheinkman, Practice Commentaries, McKinney's Cons Laws of NY, Book 14, Domestic Relations Law C236B:27, at 437-440). However, the leading New York cases on when and how marital fault may be considered are *O'Brien v O'Brien* (66 NY2d 576, 589-590) and *Blickstein v Blickstein* (99 AD2d 287, 290-293, *appeal dismissed* 62 NY2d 802; *see also McMahan v McMahan*, 100 AD2d 826). These cases hold that Domestic Relations Law § 236 (B) (5) (d), the statute listing the 13 factors to be considered in awards of equitable distribution, provides that marital fault may be taken into consideration pursuant to the statute's catchall provision (formerly clause [10], now clause [13] pursuant to a 1986 amendment), which allows consideration of "any other factor" which may be "just and proper." They go on to specify that marital fault only be taken into consideration where "the marital misconduct is so egregious or uncivilized as to bespeak of a blatant disregard of the marital relationship—misconduct that 'shocks the conscience' of the court thereby compelling it to invoke its equitable power to do justice between the parties" (*Blickstein* at 292; *see also O'Brien* at 589).

On this appeal, defendant contends that subsequent cases regarding the consideration of fault have added a second, economic component to the *Blickstein* test: whether the spouse's misconduct has "such adverse physical and/or psychological effect upon the innocent spouse so as to interfere with her ability to be, or to become self-supporting" (*Wenzel v Wenzel*, 122 Misc 2d 1001, 1002 [husband, without provocation, attacked wife with a knife inflicting multiple stab wounds and leaving her for dead]; *see also Thompson v Thompson*, NYLJ, Jan. 5, 1990, at 28, col 3 [husband raped his 17-year-old stepdaughter]).

While defendant correctly cites *Wenzel* and *Thompson*,* we agree with plaintiff's response to this argument, that these decisions are unsupported by any other authority, do not accord with higher, controlling authorities, are not binding on this Court, and are unpersuasive. These Second Department trial-level decisions are at odds with *Blickstein* and *O'Brien*. *Blickstein* expressly distinguishes marital fault from "economic fault," the dissipation, secreting or other unfair hindrance of the equitable distribution of marital assets (*Blickstein* at 293).

It is our view that *McCann v McCann* (156 Misc 2d 540) best explains what the appellate courts mean by "egregious" and offers a framework that harmonizes those decisions with *Wenzel* and *Thompson*. The *McCann* court found a husband's conduct to be nonegregious where he deceitfully entered into a marriage based upon his promise to make every effort to have children with his wife and he subsequently refused to fulfill that promise after several years of lying, resulting in the wife, who relied on his promise, passing the age of child-bearing without having a child. *McCann*, discussing the *Blickstein* formulation, explained that "egregious" and "conscience-shocking" have no meaning outside of a specific context, and that conduct is "conscience-shocking, evil, or outrageous" only when "the act in question grievously injures some highly valued social principle." (*Id.* at 545.) Therefore, the court concluded, conduct no matter how violent or repugnant is "egregious" only where it substantially implicates an important social value. The court further noted that the cases that have taken marital fault into consideration involved the paramount social values: preservation of human life and "the integrity of the human body" (*McCann* at 547).

Thus, the *McCann* court, unlike the *Wenzel* and *Thompson* courts, does not include impairment of economic independence in the definition of "egregious," but does explain the effort on the part of those courts to lend meaning to the term in the marital fault context and to identify a harm to a significant

---

* He also relies upon, incorrectly, *Murtha v Murtha* (NYLJ, May 15, 1998, at 29, col 4 [husband's long history of physical and emotional abuse of wife culminating in an incident resulting in husband's arrest for assault and reckless endangerment]) and *Pollack v Pollack* (NYLJ, Oct. 25, 1999, at 40, col 3 [husband stabbed wife repeatedly with butcher knife while she slept]); in each case, while the court found that the husband's acts of domestic violence were egregious, prevented or diminished the wife's ability to be self-supporting and should affect the award of equitable distribution, it never reached the question of whether a showing of economic effect is required to establish egregiousness.

social value. Its reading of *Blickstein* also invokes the important rule in equity that a person should not be allowed to profit from his own wrongdoing, as defendant here callously seeks to do.

Defendant further argues on the issue of fault that the court incorrectly considered his fault. He alleges that while the court claims to have given due consideration to all of the 13 factors listed at Domestic Relations Law § 236 (B) (5) (d) as is mandated, in reality it based its equitable distribution determination completely upon his marital fault, especially the events of April 22, 1999. While he concedes that his economic contribution was nonexistent once he was laid off from his last job in 1990, he argues that his evidence of his contributions to the family, active involvement in child-rearing and education, housekeeping and management, was completely disregarded.

We find that the trial court properly exercised its broad discretion in determining equitable distribution here, inasmuch as its determination is firmly based on record evidence, and should not be disturbed (*see Elkaim v Elkaim*, 176 AD2d 116, *appeal dismissed* 78 NY2d 1072; *Schammel v Schammel*, 161 AD2d 407, 408-409, *lv dismissed* 76 NY2d 844; *Leider v Otero-Leider*, 161 AD2d 277). The trial court's decision specifically addresses each of the 13 factors and sets forth factual findings that support its conclusions.

As for the assault on plaintiff, we find that the trial court gave the incident its due consideration. The cases defendant cites in this regard as comparably egregious to his own are readily distinguishable factually. For instance, he relies on *Brancoveanu v Brancoveanu* (145 AD2d 395, *lv dismissed* 73 NY2d 994), where the husband contracted for the wife's murder, abandoned the scheme prior to implementation and, upon equitable distribution, recovered, among other things, 40% of the proceeds from the sale of the marital residence. Obviously defendant's conduct herein was far more shocking and despicable. The authorities that plaintiff cites in this regard, such as *Venkursawmy v Venkursawmy* (NYLJ, Mar. 16, 1990, at 22, col 5 [husband poured gasoline on wife and struck match]) and *Wenzel v Wenzel* (*supra* [husband stabbed wife numerous times with knife and left her for dead]), are far more indicative of the circumstances at bar; in those cases the court awarded no marital property to the attempted murderer/spouse. Moreover, it is precisely the type of "egregious," "conscience-shocking" conduct defined in *McCann*.

Defendant's witnesses and evidence as to the extent of his contributions to the household and the children's welfare were

controverted by plaintiff and her witnesses, including the nanny and two of the children, who all testified that defendant contributed little. Under such circumstances, the trial court's assessment of the evidence and credibility of these conflicting witnesses is entitled to substantial deference.

Finally, defendant's objection to the trial court's alleged wrongful characterization of the April 22, 1999 incident as an attempted murder, because he only pleaded guilty to first-degree assault, is without merit. Based upon the evidence of defendant's conduct presented to the court, the court had ample evidence under the preponderance of evidence standard to find that his conduct was an attempted murder. The court was not bound by defendant's generous plea bargain.

On the issue of attorneys' fees, we find that the trial court did not abuse its discretion in denying defendant attorneys' fees after trial based on the "extraordinary circumstances" here. "The matter of counsel fees is within the court's discretion to be controlled by the equities and circumstances of each particular case" (*Basile v Basile*, 122 AD2d 759, 760, quoting *Ritz v Ritz*, 103 AD2d 802; *see also Dunnan v Dunnan*, 261 AD2d 195, 196, *lv denied* 93 NY2d 816). It would hardly be just to require plaintiff to pay defendant's attorneys' fees after his murderous attack on plaintiff and the court properly took this into account.

Defendant's argument that the trial court's denial of attorneys' fees harmed the public interest by ignoring the public policy considerations underlying Domestic Relations Law § 237 (a) and by punishing counsel for defendant's prelitigation misconduct is without merit.

> "[Domestic Relations Law § 237 (a)] * * * is designed to redress the economic disparity between the monied spouse and the non-monied spouse. Recognizing that the financial strength of matrimonial litigants is often unequal * * * the Legislature invested Trial Judges with the discretion to make the more affluent spouse pay for legal expenses of the needier one. The courts are to see to it that the matrimonial scales of justice are not unbalanced by the weight of the wealthier litigant's wallet" (*O'Shea v O'Shea*, 93 NY2d 187, 190).

Domestic Relations Law § 237 (a) expressly allows the court to order the wealthier party to pay the needier party's attorneys' fees on an interim basis during the litigation as a

means of ensuring the integrity of the proceedings. This is precisely what occurred here. Defendant received awards totaling $377,500 during the course of this litigation, most of which he used for attorneys' fees. Inasmuch as it appears from his filings on this appeal that he has been capably represented throughout this litigation, his contention that the court ignored the public policy of litigation parity here is unsubstantiated.

Furthermore, his contention that the court's decision as to attorneys' fees unfairly punishes his counsel and sets a poor precedent as a matter of public policy by discouraging counsel in general from taking on similar cases is also unsubstantiated and must fail. It is an elemental component of the private practice of law that attorneys assess potential cases from a business as well as a legal standpoint. They adjust their fees and retainers to reflect various circumstances. For example, in the numerous cases, often criminal, where the outcome is likely to be negative and there are likely to be scant financial resources by the time the matter is resolved, attorneys routinely require a more substantial initial retainer to accept the case.

Defendant's final contention is that the trial court should have granted him a 50% setoff in plaintiff's separate tort action in the amount of the equitable share of marital property he was denied. This contention is also without merit. Any such ruling by the trial court in this divorce action would be speculative and amount to an advisory opinion, since the tort matter has yet to go to trial. Moreover, an award and the amount of such a setoff should only be determined by the court in the tort case and only if and when plaintiff prevails.

Accordingly, the judgment of the Supreme Court, New York County (Jacqueline Silbermann, J.), entered August 28, 2001, which, inter alia, limited defendant's equitable distribution of the marital assets to 4.5% and denied him an award of counsel fees, should be affirmed, without costs.

ROSENBERGER, RUBIN, FRIEDMAN and GONZALEZ, JJ., concur.

Judgment, Supreme Court, New York County, entered August 28, 2001, affirmed, without costs.