[876 NYS2d 351]

Howard S., Appellant, v Lillian S., Respondent. Ryan M., Respondent.

First Department, March 17, 2009

## APPEARANCES OF COUNSEL

*Blank Rome, LLP*, New York City (*Donald Frank, Leonard G. Florescue* and *Jennifer S. Smith* of counsel), for appellant.

*Mischel & Horn, P.C.*, New York City (*Scott T. Horn* of counsel), and *Berkman, Bottger & Rodd, LLP*, New York City, for Lillian S., respondent.

## OPINION OF THE COURT

FREEDMAN, J.

This interlocutory appeal in a matrimonial action raises two issues. The first is whether defendant wife's alleged misrepresentation to plaintiff husband that he was the biological father of one of their children, when in fact the child was conceived during her adultery and fathered by her lover, constitutes "egregious fault" sufficient to be considered in equitably

distributing the marital property. We affirm the motion court's holding that, under the circumstances here, it should not. The second is whether the motion court properly limited plaintiff's recovery for his fraud cause of action. Again, we affirm the motion court's holding.

According to the verified complaint filed in March 2008, plaintiff married defendant in May 1997 and they have four children. In or about February 2004, defendant had an extramarital affair with an unnamed man and became pregnant with a child, Charles, who was born in December 2004. Plaintiff contends that defendant knew or should have known that plaintiff was not Charles's biological father, but concealed that information from him. Plaintiff states that he "raised Charles as his own child, nurturing him and providing the same financial and emotional support as all his other children."*

The complaint further alleges that in or about February 2007 defendant began another affair with the named co-respondent which "continues to this day." Defendant also concealed this second adulterous relationship from plaintiff, but in the spring of 2007, she suggested that they separate and enter into a collaborative law process.

During this period plaintiff had become suspicious about Charles's parentage, allegedly "due to all the jokes within his and [defendant's] circle of family and friends that Charles looked nothing like him." Without telling his wife, plaintiff in February 2008 arranged for a DNA test of himself and Charles. The test confirmed that plaintiff was not Charles's biological father. Defendant now acknowledges that plaintiff is not Charles's biological father, but claims that she learned this from the DNA test results and denies that she deliberately concealed the truth about Charles's parentage from plaintiff.

The complaint asserts causes of action for divorce based on both cruel and inhuman treatment and adultery, and asserts a separate claim based on fraud. As damages for the fraud claim, plaintiff seeks to recover his child support expenses for Charles, the fees for the parties' collaborative law process, and profits from the couple's investments "from the time of Charles's conception until the commencement of this action." Defendant answered and counterclaimed for divorce on the ground of abandonment.

---

* Plaintiff is also not the biological father of another of his children, defendant's daughter Kimberly, whom plaintiff adopted.

190

In May 2008, defendant moved for an order dismissing or severing the fraud claim; plaintiff opposed and cross-moved for "liberal discovery" to prove "defendant's egregious fault," the fraud claim, and her lack of contribution to and dissipation of the marital property. The motion court denied the motion to dismiss or sever the fraud claim, but limited the recoverable damages to plaintiff's share of the fees for the collaborative law process. The court also denied plaintiff's cross motion for expanded discovery as to defendant's marital fault on the ground that defendant's alleged misconduct did not constitute egregious fault and had no bearing on prospective spousal maintenance and equitable distribution. Finally, the court held that "[a]ll relief not expressly granted is denied." Plaintiff appealed on the grounds that the court (1) erred by holding that he had failed to state a claim for egregious fault and (2) erred by holding that he could not recover child support payments and certain real estate investments as damages for his fraud claim.

Defendant has not appealed the court's order in connection with the fraud claim, and accordingly the issues before this Court concern the rulings on plaintiff's cross motion. The first concerns whether defendant's conduct constitutes "egregious fault" that should be considered in distributing the marital property and which entitles him to further discovery about her misconduct. As a threshold matter, we reject defendant's assertion that plaintiff failed to preserve this issue on appeal. Although the complaint does not specifically characterize defendant's alleged misconduct as egregious fault, plaintiff raised that argument before the motion court in his cross motion papers.

■ The motion court properly ruled that the wife's infidelity and concealment of Charles's parentage has no bearing on the equitable distribution of the marital property. As a rule, the marital fault of a party is not a relevant consideration under the Equitable Distribution Law. (*Havell v Islam*, 301 AD2d 339, 344 [2002], *lv denied* 100 NY2d 505 [2003].) However, it is well settled that Domestic Relations Law § 236 (B) (5) (d), which lists the specific factors that a court is to weigh in determining equitable distribution, provides that, in limited circumstances, marital fault may be considered pursuant to paragraph (d) (13) of the statute, the "catchall" provision that allows the court to take "any other factor" which may be "just and proper" into account (*O'Brien v O'Brien*, 66 NY2d 576, 589-590 [1985]; *Blickstein v Blickstein*, 99 AD2d 287, 292 [1984], *appeal dismissed* 62

NY2d 802 [1984]). Marital fault can only be considered where the misconduct "is so egregious or uncivilized as to bespeak of a blatant disregard of the marital relationship—misconduct that 'shocks the conscience' of the court[,] thereby compelling it to invoke its equitable power to do justice between the parties" (*Blickstein*, 99 AD2d at 292; *accord O'Brien*, 66 NY2d at 589).

In *Havell*, this Court adopted the analysis set forth in *Mc-Cann v McCann* (156 Misc 2d 540 [1993]), which concerned a husband who had married with the express promise to his wife to make every effort to have children. He subsequently refused to fulfill that promise after several years of lying, and as a result his wife became infertile because of her advanced age. The court found that, while the husband's misconduct showed "a blatant disregard for the marital relationship" and was "morally reprehensible," it did not constitute egregious marital conduct sufficient to be considered in equitably distributing the marital assets (*McCann*, 156 Misc 2d at 547, 549). To be deemed egregious, the court concluded, conduct must "callously imperil[ ] the value our society places on human life and the integrity of the human body" (*id.* at 547; *accord Havell*, 301 AD2d at 345).

The only cases in which reprehensible behavior has been deemed to constitute egregious fault sufficient to affect equitable distribution have involved extreme violence. In *Havell*, for example, this Court upheld the matrimonial court's award of more than 95% of the marital estate to a wife where her husband beat her with a barbell and a piece of pipe, thereby breaking her nose, jaw and some of her teeth, causing multiple contusions and lacerations, along with neurological damage and other serious injuries. While the husband pleaded guilty to first-degree assault on his wife, this Court supported the matrimonial court's finding that the husband's attack amounted to attempted murder and constituted egregious marital fault. Egregious fault has also been found in instances of rape (*see Thompson v Thompson*, NYLJ, Jan. 5, 1990, at 28, col 3 [husband raped his stepdaughter]), kidnapping (*see Safah v Safah*, NYLJ, Jan. 8, 1992, at 26, col 5 [in midst of hearing on equitable distribution and custody, husband took couple's two children and fled to Lebanon with them, where he left them in a "war zone"]), and protracted and severe physical abuse (*see Debeny v Debeny*, NYLJ, Jan. 24, 1991, at 29, col 2 [over course of 37-year marriage, husband broke wife's foot by stamping on it, broke one of her fingers, pulled her arm out of its shoulder

socket, cracked two of her teeth by punching her cheek, pushed her causing her to break her arm, pushed her on another occasion causing her to fall and break her ankle, slapped her face between 50 and 70 times per year, and committed other violent acts against her]).

Conversely, conduct that courts have found not to be egregious includes adultery (*see Lestrange v Lestrange*, 148 AD2d 587, 588 [1989]), alcoholism (*see Weilert v Weilert*, 167 AD2d 463 [1990]), abandonment (*see Wilson v Wilson*, 101 AD2d 536 [1984], *lv denied* 64 NY2d 607 [1985]), and verbal harassment coupled with several acts of minor domestic violence (*see Kellerman v Kellerman*, 187 AD2d 906 [1992]).

Here, while defendant's alleged misconduct cannot be condoned and is clearly violative of the marital relationship, it does not rise to the level of egregious fault, since defendant neither endangered the lives or physical well-being of family members, nor deliberately embarked on a course designed to inflict extreme emotional or physical abuse upon them.

We find the dissent's arguments to the contrary to be unpersuasive. While the dissent first contends that defendant, by allegedly concealing Charles's parentage from plaintiff and allowing him to "raise the child as his own and develop a strong father-son bond," showed "a blatant disregard for the health and emotional well-being of plaintiff and the other children," that alleged deception has not harmed either plaintiff's health or the children's health and well-being. While plaintiff's emotional state may be affected by learning that a child he nurtured and bonded with is not biologically related to him, his parental relationship with Charles is not necessarily affected. Moreover, in the vast majority of cases divorce causes emotional trauma to spouses and their family, yet the fault of the parties who caused their marriages to fail has never been deemed egregious merely because that failure inflicted emotional pain on their spouses or other family members.

The dissent also makes much of a belief that defendant "risked[ ] and continues to place" Charles's health "in jeopardy" by misrepresenting his parentage to doctors and hospitals, and by concealing the biological father's medical history from them. However, plaintiff does not contend that defendant has ever made any such misrepresentations to or concealed information from medical providers or personnel concerning Charles, and the record is barren of any evidence of her having done so. Moreover, there is no basis to assume that any prior conceal-

ment jeopardized Charles's health, or that defendant would dissemble or refuse to disclose information about his parentage in the future if the need were to arise, especially since she undisputedly is now aware that plaintiff is not Charles's biological father.

Given the absence of egregious fault, the motion court correctly precluded any disclosure in connection with defendant's marital fault.

■ The second issue on appeal concerns the extent of the damages that are recoverable on the fraud claim, which is based on allegations that defendant concealed her adultery and Charles's parentage from plaintiff. We agree with the court that plaintiff's recovery is limited to the actual pecuniary losses he suffered as a direct result of the alleged fraud (*see Geary v Hunton & Williams*, 257 AD2d 482 [1999] [out-of-pocket rule barred attorney from recovering for lost enhanced earning potential allegedly caused by firm's exaggeration about the profitability of its practice]). Plaintiff's pecuniary loss is limited to the calculable expenditure flowing directly from defendant's fraud, specifically the fees plaintiff paid for the parties' collaborative law process. Since lost profits are not recoverable in fraud (*see Lama Holding Co. v Smith Barney*, 88 NY2d 413, 421 [1996]), plaintiff cannot seek to recover the profits from the couple's investments which may be distributed to defendant.

Nor can plaintiff recover in fraud for moneys he expended for Charles's support. He argues that if he had known about defendant's infidelity earlier, he might have immediately filed for divorce and ensured that Charles's biological father supported him. The nexus between the particular fraud and the injury that plaintiff now claims is too remote and speculative to support a claim for damages (*see e.g. National Union Fire Ins. Co. of Pittsburgh, Pa. v Christopher Assoc.*, 257 AD2d 1, 9 [1999]).

■ While the court did not squarely address whether plaintiff could seek punitive damages for defendant's alleged fraud, it implicitly rejected that claim when it held that "[a]ll relief not expressly granted is denied." We agree that punitive damages are inappropriate here, in that such damages have been limited to "conduct evinc[ing] a high degree of moral turpitude and demonstrat[ing] such wanton dishonesty as to imply a criminal indifference to civil obligations" (*Walker v Sheldon*, 10 NY2d 401, 405 [1961]). A wife's infidelity and her alleged concealment from her spouse of their child's paternity does not rise to such a

high degree of moral turpitude. Insofar as *Kujek v Goldman* (150 NY 176, 177-179 [1896]) lends any support for plaintiff's punitive damages claim, it is rejected. In *Kujek*, the Court held that a plaintiff could recover punitive damages from a defendant when he falsely induced plaintiff to marry a woman by misrepresenting that she was "a virtuous girl," although she was at that time pregnant with defendant's child (*id*. at 177). The facts of *Kujek* are inapposite in that it involves a third person and its holding reflects the moral standards of an earlier era.

Defendant's motion for an order directing the use of an anonymous caption is denied, since she has not shown that anonymity is necessary to protect Charles's interests (*see Anonymous v Anonymous*, 27 AD3d 356, 361 [2006]).

Accordingly, the order of Supreme Court, New York County (Harold B. Beeler, J.), entered July 11, 2008, which, to the extent appealed from, denied plaintiff's cross motion for "liberal discovery," and limited his recovery of compensatory damages for his fraud claim against his wife to his share of the collaborative law process fees, should be affirmed, without costs.

Motion seeking leave for anonymous caption and for other related relief denied.

NARDELLI, J. (dissenting). I respectfully dissent to the extent that I find, inter alia, that it was premature for the motion court, at this juncture in the proceedings, to rule that defendant wife's behavior does not, as a matter of law, constitute egregious misconduct for the purposes of equitable distribution under the Domestic Relations Law.

The New York State Legislature, in 1980, enacted the Equitable Distribution Law (EDL) (Domestic Relations Law § 236 [B], as added by L 1980, ch 281, § 9), the adoption of which had been advocated because the traditional common-law theory of property resulted in inequities upon the dissolution of a marriage. The EDL was premised on the entirely new theory that a marriage is an economic partnership to which both parties contribute as spouse, wage earner or homemaker, and mandates the equitable distribution of marital assets based upon the circumstances of each particular case (*O'Brien v O'Brien*, 66 NY2d 576, 585-586 [1985], citing Assembly Mem, 1980 NY Legis Ann, at 129-130; Governor's Approval Mem, 1980 McKinney's Session Laws of NY, at 1863; *see also K. v B.*, 13 AD3d 12, 17 [2004], *appeal dismissed* 4 NY3d 776 [2005], quoting *Brennan v Bren-*

*nan*, 103 AD2d 48, 52 [1984] ["The distribution of marital assets depends not only on the financial contribution of the parties 'but also on a wide range of nonenumerated services to the joint enterprise, such as homemaking, raising children and providing the emotional and moral support necessary to sustain the other spouse in coping with the vicissitudes of life outside the home"]). Domestic Relations Law § 236 (B) (5) (d) lists 13 factors to be considered when making an equitable distribution award, which factors encompass, among other things, the income and property of each party at the time of the marriage and at the time the divorce action was commenced, the duration of the marriage, the age and health of the parties, a maintenance award if one had been issued, and the nontitled spouse's direct or indirect contributions to the marriage.

While the courts of this state initially wrestled with the concept of whether marital fault is a relevant consideration in the distribution of marital assets, as well as how that fault should be defined (*see McCann v McCann*, 156 Misc 2d 540, 543-544 [1993]), it is now recognized that marital fault may be taken into account under the EDL's "catchall provision," which allows for the consideration of "any other factor which the court shall expressly find to be just and proper" (Domestic Relations Law § 236 [B] [5] [d] [13]; *see also Levi v Levi*, 46 AD3d 520, 521 [2007], *lv dismissed* 10 NY3d 882 [2008]; *Havell v Islam*, 301 AD2d 339, 344 [2002], *lv denied* 100 NY2d 505 [2003]). The criteria which must be considered when evaluating whether marital fault should play a role in any particular case were first enunciated by the Appellate Division, Second Department, in *Blickstein v Blickstein* (99 AD2d 287 [1984], *appeal dismissed* 62 NY2d 802 [1984]), which stated that the "marital misconduct [must be] so egregious or uncivilized as to bespeak of a blatant disregard of the marital relationship—misconduct that 'shocks the conscience' of the court thereby compelling it to invoke its equitable power to do justice between the parties" (*id*. at 292). This guideline was explicitly adopted by the Court of Appeals in *O'Brien v O'Brien* (66 NY2d at 589-590).

In the matter at bar, plaintiff alleges[1] that the parties met in 1993 while defendant, a single mother, was employed in the

---

1. In evaluating a motion to dismiss brought pursuant to CPLR 3211, the court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d 83, 87-88 [1994], *see also Morone v Morone*, 50 NY2d 481, 484 [1980]).

World Trade Center (WTC) checking employee and visitor identifications in the reception area. Plaintiff, a corporate attorney, worked in a law firm located within the WTC complex. The parties were married in 1997, had a son in March 1998 and a daughter in May 1999, and plaintiff legally adopted defendant's then eight-year-old daughter in December 1999.

In early 2004, defendant became pregnant by an as yet unidentified man with whom she was conducting an extramarital affair, and thereafter gave birth to a son in December 2004. Plaintiff, at the time unaware of the affair, had no reason to suspect that the son defendant gave birth to was not his biological child, and defendant made no effort to inform him of the possibility, allowing plaintiff to raise the child believing it to be of his own issue.

In February 2007, defendant began another affair with corespondent Ryan M., a representative from the Port Authority's general contractor for the WTC reconstruction site, who had been dispatched to the parties' marital residence to check on possible damage to their building caused by construction in the area. Defendant thereafter began spending large blocks of time away from plaintiff and her children while embarking on numerous trips with M., including one in which they traveled to Argentina for 18 days. During the course of these trips, plaintiff was left to care for the children, in at least one instance taking them on vacation by himself, while defendant remained largely incommunicado, refusing to provide contact information to her husband. Plaintiff also avers that during one family vacation to San Diego, M. secretly followed the family to the West Coast, where defendant shunned dinner and day trips with her husband and children so that she could spend time with M.

Plaintiff states that in the face of defendant's repeated and extended absences, her increased spending habits, and frequent jokes from family and friends about the lack of physical resemblance between himself and his youngest child, he brought his son for a DNA marker test while defendant was in Argentina with M. Plaintiff was subsequently informed that there was a 0% chance he was the biological father of the youngest child, and plaintiff eventually commenced this divorce action.

Defendant thereafter moved, by order to show cause, to dismiss plaintiff's third cause of action sounding in fraud, and plaintiff cross-moved for liberal discovery in order to demonstrate that he properly pleaded allegations of fraud, to establish defendant's egregious conduct, to demonstrate defendant's lack

of contribution to the acquisition of marital property, and to prove her dissipation of marital assets. The motion court denied plaintiff's cross motion for liberal discovery, finding, among other things, that defendant's misconduct did not rise to the level set forth in *Blickstein*, and limited plaintiff's recovery of compensatory damages for fraud to his share of the collaborative law process fees.[2]

In analyzing whether defendant's conduct satisfies the egregious misconduct standard set forth in *Blickstein*, there can be, in my view, no dispute that defendant's actions "bespeak of a blatant disregard of the marital relationship," the foundation of which relationship must rest on mutual love, trust and respect. The question then becomes whether defendant's behavior was so egregious as to shock the conscience of the court or, stated another way, "whether the social values contravened by the offending spouse's behavior is [*sic*] so important that some punitive response in the context of equitable distribution is appropriate" (*McCann v McCann*, 156 Misc 2d at 548). The majority, on the other hand, limits the misconduct necessary to establish the standard for marital fault—misconduct "so egregious or uncivilized as to bespeak of a blatant disregard of the marital relationship" (*Blickstein* at 292)—to misconduct of a physical nature.

Defendant contends that plaintiff's request for expanded discovery reflects the actions of a vengeful husband and that her behavior equates to nothing more than adultery, which is insufficient to shock the conscience of the court.[3] The majority, in apparent agreement with defendant, employs the considerable understatement that defendant's multiple affairs, her concealment from plaintiff, for more than four years, that he was likely not the father of her youngest child, allowing him to raise him as his own, and her continued refusal to identify the father, despite plaintiff's appeals that the information is neces-

2. Plaintiff and defendant, apparently some time after they separated in mid-2007, entered into a joint effort to reach a legal resolution of their marital problems.

3. Defendant ruminates that "[e]ven if one assumes that the [defendant] knew to a certainty that the [plaintiff] was not [the child's] biological father, the alleged silence is just as likely to have been an attempt to preserve marital and family relationships as to disregard them." It is unclear, however, how this generous gesture ties in with defendant's subsequent dalliances and numerous, prolonged "vacations" and, in fact, lends itself more readily to plaintiff's theory that defendant was deliberately delaying the end of the marriage in order to increase her share of a rapidly rising financial portfolio.

sary for medical reasons, constitutes nothing more than "alleged misconduct [that] cannot be condoned and is clearly violative of the marital relationship."

Defendant accurately depicts the current state of the law in New York when she opines that adultery per se does not fall within the parameters of egregious conduct for the purposes of determining marital fault (*see e.g. Newton v Newton*, 246 AD2d 765 [1998], *lv denied* 91 NY2d 813 [1998]; *Smith v Smith*, 151 AD2d 232 [1989]; *Rosenberg v Rosenberg*, 126 AD2d 537 [1987], *lv denied* 70 NY2d 601 [1987]; *Wilbur v Wilbur*, 116 AD2d 953 [1986]). Nevertheless,

> "[w]hile serious and egregious marital misconduct . . . [is more often found to include] spousal abuse, domestic violence, and attempted murder, it is not limited solely to physical or mental cruelty; adultery that substantially contributes to the dissolution of a marriage is also recognized as a relevant fault-based factor in a substantial majority of jurisdictions" (Swisher, *Marriage and Some Troubling Issues with No-Fault Divorce*, 17 Regent U L Rev 243, 257 [2004-2005]).

We must, however, also take into account plaintiff's assertion that defendant conceived a child during the course of one of her affairs and intentionally concealed the parentage of that child from plaintiff for a number of years, allowing him to raise the child as his own and develop a strong father-son bond, which evinces nothing less than a blatant disregard for the health and emotional well-being of plaintiff and the other children (*Winner v Winner*, 171 Wis 413, 417-418, 177 NW 680, 682 [1920] ["the concealment by the woman of the paternity of her child is a fault so grievous that there is no excuse or palliation for it]";[4] *see also* Linda L. Berger, *Lies Between Mommy and Daddy: The Case for Recognizing Spousal Emotional Distress Claims Based on Domestic Deceit that Interferes with Parent-Child Relationships*, 33 Loyola LA L Rev 449 [2000] [having a close and loving parent-child relationship suddenly destabilized by the revelation that no biological relationship exists has the potential to cause grief, anxiety, shock and fear]).

Plaintiff, in fact, is faced with the unenviable choice of devastating the child immediately by revealing the truth, and in

---

4. It is unclear if the majority's rejection of any significant social value component to "the moral standards of an earlier era" also applies to the early twentieth century and the observation of the Wisconsin Supreme Court.

the course of doing so risking his relationship with the child and the child's relationship with his siblings, or lying to the child indefinitely and continually despairing about the consequences when the truth is finally revealed.

Finally, and most importantly, defendant risked, and continues to place in jeopardy, the health of the child by misrepresenting medically necessary parental information to doctors and hospitals, conveying to them that plaintiff was the child's father and, after the truth was revealed, and despite plaintiff's protestations, continuing to refuse to provide the biological father's medical history, thereby allowing the child's medical history to contain significant, potentially life-threatening gaps. While the majority finds that this conduct "does not rise to the level of egregious fault," I take a dimmer view.

In *Havell v Islam,* this Court cited with approval Justice Saxe's interpretation, as set forth in *McCann v McCann,* of "egregious" and "conscience-shocking" as having "no meaning outside of a specific context, and that conduct is 'conscience-shocking, evil, or outrageous' only when 'the act in question grievously injures some highly valued social principle' " (*Havell,* 301 AD2d at 345, quoting *McCann,* 156 Misc 2d at 545).

> "Therefore, the court concluded, conduct no matter how violent or repugnant is 'egregious' only where it substantially implicates an important social value. The court [in *McCann*] further noted that the cases that have taken marital fault into consideration involved the paramount social values: preservation of human life and 'the integrity of the human body' " (*Havell* at 345, quoting *McCann* at 547).

One commentator, in discussing why paternity establishment is important and, specifically, how that issue affects medical interests, opined:

> "*With the growing ability to diagnose and treat genetically based and genetically influenced diseases, having access to information about one's genetic heritage is increasingly important.* Individuals who lack the medical history of both parents are at a disadvantage in the diagnosis and treatment of a variety of diseases compared to those who possess such information. Those who have a false belief about the identity of their genetic father are further disadvantaged: they lack knowledge of their true genetic

ancestry, hold false beliefs about it, and are generally unaware of their ignorance and false beliefs. *For their entire lives, they may unwittingly be giving doctors false information with potentially lethal consequences. Children receive a clear medical benefit from paternity establishment based simply on the increased knowledge of their genetic endowment. Those who deny a person the right to knowledge of his genetic ancestry—or, worse, mislead him about it—are harming the person in ways that could result in the needless death of that person.*

"The child's medical interest in the establishment of paternity is not simply limited to the genetic predisposition towards disease. Should illness or injury necessitate an organ replacement, genetic relatives are the best candidates for donors. Consequently, children whose paternity has not been established are disadvantaged because their pool of potential donors is reduced. In addition, since the likelihood of organ donation presumably is increased when parents and children are tied to one another by bonds of affection—rather than the relatively sterile cognitive consciousness of genetic relatedness—children have an interest, based on the possibility of organ donation, in the early establishment of paternity and fostering a parent/child relationship with their genetic father throughout their lives" (Hubin, *Daddy Dilemmas: Untangling the Puzzles of Paternity*, 13 Cornell JL & Pub Pol'y 29, 32-33 [2003] [footnotes omitted and emphasis added]).

Indeed, in 1983, the New York State Legislature, recognizing the vital role genetics plays in the medical history, diagnosis and treatment of a child for any number of illnesses, or in preparation for a multitude of medical procedures, enacted Social Services Law § 373-a (L 1983, ch 326, as amended by L 1985, chs 103, 142), which provides that medical histories should be disclosed to preadoptive parents and adult adoptees, with the 1985 amendment expanding the coverage of the statute to include adoptive parents. In a memorandum to Alice Daniel, Counsel to the Governor, seeking approval of the bill, Cesar A. Perales, Commissioner of the New York State Department of Social Services, stated that the medical history of children is

"helpful in diagnosing an illness or deciding on a

course of treatment for the child. Such information could contain data relating to hereditary disorders which may have been passed on to the child from the child's natural parents or to data concerning drugs to which the child is allergic" (Mem From Cesar A. Perales, June 3, 1983, Bill Jacket, L 1983, ch 326, at 13).

In this matter, taking the allegations as set forth by plaintiff as true, I find defendant's willingness to play fast and loose with the health of her child by knowingly misleading his health care providers as to his true genetic background, thereby providing, in essence, a false medical history, and then refusing to rectify the situation when asked to do so, implicates and contravenes the paramount social values discussed in *Havell v Islam* and *McCann v McCann*. Moreover, when considering the foregoing conduct, coupled with defendant's multiple acts of adultery, her numerous, sometimes lengthy trips with her lover during which she maintained no contact with her husband and children, her willingness to allow her lover to secretly accompany her on a family vacation, and her dissipation of assets, I find it is sufficient, at this juncture, to state a claim that defendant engaged in egregious conduct as set forth in *Blickstein*, and further, to foreclose dismissal of any of plaintiff's claims and to warrant granting the liberal discovery sought in his cross motion.

SAXE, J.P., MOSKOWITZ and RENWICK, JJ., concur with FREEDMAN, J.; NARDELLI, J., dissents in a separate opinion.

Order, Supreme Court, New York County, entered July 11, 2008, affirmed, without costs.