[784 NYS2d 76]

# K., Respondent, v B., Appellant.

First Department, November 9, 2004

**APPEARANCES OF COUNSEL**

*Ronald Cohen*, New York City, for appellant.

*Katten Muchin Zavis Rosenman*, New York City (*Bernard E. Clair* of counsel), for respondent.

## OPINION OF THE COURT

MARLOW, J.

This appeal presents an unusual set of facts, whose most pertinent aspects are substantially set forth in the dissent. The parties' marriage was unconventional in certain ways, but that lack of convention does not, as the defendant husband would have it, trump the settled equitable distribution principles which have evolved in New York since 1980. For that reason we most respectfully disagree with our dissenting colleague(s) and affirm the trial court.

### Cruel and Inhuman Treatment

■ Without citing any legal authority, the husband argues that the wife could not establish cruel and inhuman treatment as a ground for divorce since the parties did not cohabit, but rather maintained separate residences—the wife in Manhattan and the husband in Putnam County. However, in considering a cause of action for cruel and inhuman treatment, the factfinder

should focus primary attention on the nature of the interaction between a husband and wife, rather than on the type of living arrangement they have.

After trial, the court made express findings of fact in favor of the wife's claim of cruel and inhuman treatment. Specifically, the court found sufficient proof that the husband committed "marital rape" more than once; that the husband wiretapped and monitored the wife's telephone conversations without her knowledge; that the husband accused the wife of adultery; that the husband threatened to ruin the wife's business; that the husband refused to discuss his finances with the wife, some of which involved projects which the wife was financing; that the husband engaged in "various financial maneuvers" which involved "surreptitiously" withdrawing money from joint accounts, selling stock and liquidating assets, including taking for his own benefit a $35,000 federal income tax refund check; that the husband suggested to the wife that she was mentally unstable and incapable of making decisions; that the husband wrote a "manipulative and intimidating" letter[1] to the wife's therapist; that the husband engaged in a pattern of anger followed by withdrawal when the wife wanted to talk about her feelings concerning the parties' marriage and family; that the husband continually gave the wife "mean and frightening" stares; that the husband yelled at the wife, demeaned her and berated the wife when she tried to discuss serious issues with him; that the husband engaged in a long pattern of intimidation;[2] and that when the wife was feeling "pressured" by her mounting, severe business problems, the husband remained upstate, refusing to spend any more time in New York City with her and their three children, despite her repeated requests. These incidents, evincing a long-standing pattern of emotional neglect and abuse, are

---

**1.** In the letter, the husband purported to express concern about his wife's allegedly deteriorating mental health, but urged that, since the therapist could be tired at the end of a full day at the office and therefore not totally "in touch," the therapist should possibly involve a psychiatrist in evaluating the wife's state. This letter was attached to a copy of a news article that described a case where a therapist was held liable for misdiagnosing a patient who subsequently killed two people. At the bottom of the article was written, "Professional Responsibility." The therapist testified that he found the husband's correspondence "quite manipulative."

**2.** In particular, the husband manipulated the wife into writing a letter at his direction, indicating that he did not treat her cruelly. The letter was to be shown to the parties' children in the event they learned of a prior divorce action which the wife had commenced, but discontinued after the husband threatened to destroy her, their family and her law practice.

amply supported by the record and they well establish the wife's cause of action for cruel and inhuman treatment (*see e.g. Allwell v Allwell*, 252 AD2d 683 [1998]; *Gascon v Gascon*, 187 AD2d 955 [1992]; *Richardson v Richardson*, 186 AD2d 946 [1992], *lv dismissed in part and denied in part* 81 NY2d 867 [1993]; *Birnbaum v Birnbaum*, 177 AD2d 367 [1991], *lv dismissed* 79 NY2d 1040 [1992]; *Rieger v Rieger*, 161 AD2d 227 [1990]). Thus, no basis exists to disturb the trial court's finding, largely one of credibility (*see Eschbach v Eschbach*, 56 NY2d 167, 173-174 [1982]), that the wife proved the stated ground for divorce.

### 65%-35% Distributive Award

■ The husband also maintains that the court erred in distributing the marital property 65%-35% in the wife's favor since the parties had a premarriage agreement requiring a 50%-50% division of all mutually held assets.[3] Although the parties signed the "agreement," it was not acknowledged or proven in the manner required to entitle a deed to be recorded (*see* Domestic Relations Law § 236 [B] [3]; *Matisoff v Dobi*, 90 NY2d 127, 130 [1997]). Therefore, the "agreement" is unenforceable, and the trial court properly rejected it as evidence.

Moreover, while the husband may have contemplated an unconventional marriage in which the parties make unequal financial and emotional contributions, but, upon dissolution, the parties are nonetheless awarded an equal distribution of marital assets, the law does not contemplate such an arrangement; especially in a two-decade-long marriage like this, where time, a variety of difficult circumstances, and the arrival of three children have together created a life the parties likely never anticipated when they wrote a so-called "agreement." That writing—created in a pre-equitable distribution context— carries no legal force save for the minor impact of its historical voice.

Under the current law, this husband cannot escape accountability for his ever-increasing family obligations simply because these otherwise intelligent parties—20 years earlier and yet to be faced with the demands of parenthood and other unanticipated challenges—had agreed to live in separate counties. While originally the wife did agree to that unorthodox arrangement, she nevertheless continued to work full time, provided the lion's

---

3. Ironically, the agreement also provides that "[a]ll child rearing shall be a joint responsibility if both [husband and wife] are working full time."

share of the family's financial support, and reared their three children virtually alone. While the dissent maintains that neither party "contemplated altering their lives so the children would have both parents around on a daily basis," they did agree that if both parents were working full time, they would jointly share responsibility for child rearing. Here, the wife worked full time and assumed virtually all child-rearing responsibility, while the husband dabbled in his projects and assumed virtually none of the child-rearing responsibility. The unexpected evolution of this couple's joint and separate lives bespeaks, with crystal clarity, the wisdom of the Equitable Distribution Law, designed so that the experience a couple endures and the contributions each spouse makes foretell the character of a marriage's end.

We therefore respectfully disagree with the dissent's position that the husband's inaction during the parties' most financially difficult periods was justified based on their premarriage "agreement" two decades earlier. During the time the wife was earning an excellent living, even though she was simultaneously and almost singlehandedly raising the children, the husband's lack of interest or help may arguably be considered of lesser importance than more recent events only because some of his proven indifference occurred earlier in their marriage. However, over the long haul, the record is clear that the husband gave very little, both financially and domestically, to his marriage and his family.

Thereafter, the family's size and financial health dramatically changed. After her law partner was suddenly killed in 1996, the wife became solely responsible for the operation of the debt-ridden law firm. Under the enormous pressure of trying to salvage the firm by herself in the wake of her partner's death and, further, upon the consequential discovery that the firm had other significant liabilities, all while at the same time raising and trying to nurture their three children, the wife asked her husband for help. He refused to step up to the plate and offer any assistance, be it financial, emotional or otherwise.

The husband's reliance on the parties' premarriage agreement became increasingly indefensible and illogical with the birth of each of his three children. We can reach no other conclusion than that the husband's indifference clearly justifies the unequal distribution of marital assets awarded by the court, not as a punitive consequence, but, rather, as a factually supported reflection of the actual contributions each spouse made to the

existence and survival of the marriage and in fulfillment of their respective roles as parents and partners.

The Domestic Relations Law contemplates an equitable, not necessarily equal, division of marital assets based on the parties' respective contributions to the marriage (*see* Domestic Relations Law § 236 [B] [5] [d] [6]). Equitable distribution is "based on the premise that a marriage is, among other things, an economic partnership to which both parties contribute as spouse, parent, wage earner or homemaker" (*O'Brien v O'Brien*, 66 NY2d 576, 585 [1985]; *accord Price v Price*, 69 NY2d 8, 14 [1986]). The distribution of marital assets depends not only on the financial contribution of the parties "but also on a wide range of nonremunerated services to the joint enterprise, such as homemaking, raising children and providing the emotional and moral support necessary to sustain the other spouse in coping with the vicissitudes of life outside the home" (*Brennan v Brennan*, 103 AD2d 48, 52 [1984] [citations omitted]; *accord Price*, 69 NY2d at 14). The evidence is abundant that the wife contributed significantly in every single category, and the husband hardly at all. Therefore, we affirm the trial court's unequal distribution of marital property, as amply supported by the record, even were we not to consider any economic fault (*see* Domestic Relations Law § 236 [B] [5] [d]).

The wife was the principal wage earner for most of the marriage. As conceded by the husband, during the second half of the marriage the wife provided nearly all of the entire family's financial support. In addition to paying all the New York City household and child care expenses, she contributed substantial sums to the husband's various real estate projects. Indeed, the husband admitted that the wife contributed between 1.5 and 2 million dollars for his projects, which, with abundant consistency, failed to produce reliable or substantial income. For example, one venture, a cattle farm in Vermont, produced "a couple of thousand dollars a year." However, the husband later testified that this project "throws off some money, but it's a much bigger loss" and with the exception of one year it never made a profit. Beyond that, the evidence unquestionably establishes that the wife undertook the herculean combined roles of full-time lawyer, primary homemaker and primary parent of the three children, all with, at best, marginal help and support from their father. As the family grew and the professional and personal demands on the wife increased, the husband—rather than pitching in more—refused to spend ad-

ditional time in New York City to help his wife with their three children.

When her law practice was failing and she needed her husband, he once again refused. This husband's telling response during these trying times was to complain that his wife was too exhausted to go out with him during the one or two evenings each week that he would journey about 60 miles to New York City. His reaction was, as the trial court put it, "selfish and self-centered," as during these "extremely stressful" events "a married person would be expected to look to her spouse at such time for emotional, if not financial support." This record depicts a husband who gave neither.

The husband also criticizes the court's determination that economic fault warranted a greater distribution of marital assets to the wife.[4] The dissent says that the court's consideration of fault is punitive. However, while most often, where a marriage is of long duration, a court does not distribute marital property unequally unless there is a finding of marital or economic fault. Here, based on these most unusual circumstances, the record fully supports an unequal distribution of assets based solely on the parties' respective, unequal contributions to the marriage. Indeed, the court specifically and correctly cites, in addition to the wife's financial contributions, her "contributions as the primary homemaker and caretaker, particularly her assumption of almost all responsibility for child-rearing" as a basis for awarding the wife the greater share of marital assets (*see* Domestic Relations Law § 236 [B] [5] [d] [6]; *cf. Greenwald v Greenwald*, 164 AD2d 706 [1991], *lv denied* 78 NY2d 855 [1991]; *Granade-Bastuck v Bastuck*, 249 AD2d 444 [1998]).

In any event, the court's finding concerning the husband's relentless appropriation of money, including money set aside for his children's education, and conversion of personalty, for his own purposes while ignoring his wife's pleas for financial and emotional assistance, further supports the trial court's conclusion that an unequal distribution of property is fair and legally justified (*see* Domestic Relations Law § 236 [B] [5] [d] [11], [13]; *Davis v Davis*, 175 AD2d 45 [1991]). In addition, the husband

---

4. The husband also argues that the court improperly found that his "conduct constituted 'egregious' marital fault." However, this is a gross and disingenuous distortion of the court's findings of fact and conclusions of law. The court acknowledged defendant's argument that marital fault is ordinarily not a factor in equitable distribution, but then observed that "economic misconduct, as distinct from marital fault, may properly be considered."

refused the wife's request to sell off some real estate holdings to produce some much needed cash. The husband also admitted that he withdrew money from an escrow account in violation of a court order. Against this backdrop of financial misconduct, it is of no moment whether the husband's actions in filing a claim for innocent spouse relief were inappropriate, as the trial court found, and as challenged by the dissent as a basis for a finding of economic misconduct.

Contrary to the dissent's conclusion that defendant liquidated marital assets, including his children's investment funds, in an attempt to earn income from developing properties, defendant admitted that he sold marital property to "fend for himself" as he understood that no money would be coming his way from his wife or her law firm. There is no evidence in the record that the husband used any of the money from the liquidated marital assets for his family's ultimate benefit. On the contrary, the husband incessantly invaded marital property for his own purposes, as he was earning no appreciable income to support either himself or his family.

This behavior stands in stark contrast to his wife's one-time liquidation of a mutual fund which she used solely to preserve the major family asset—her law practice from which the husband benefitted for many years. The wife used this money to repay investors who had placed a lien on the firm. While the husband also complains that the wife incurred millions of dollars of tax liability in her business, the firm made a business decision to pay several million dollars it owed to investors instead of paying payroll taxes. Had the firm paid the payroll taxes, it would still have owed its investors. Either way, the firm would still have significant debt, with virtually identical financial consequences for this family. Accordingly, we affirm the trial court's distribution of marital property as fairly representing the parties' lopsided contributions to the marriage.

## Valuation of Wife's Business

The husband also challenges the court's finding that the wife's firm had no value. However, there is no dispute that at the time the wife commenced this action, her firm's tax liabilities and other debt far outweighed any assets. Consequently, when the husband offered no evidence to the contrary, the court correctly found that the firm had no value whatsoever. That the court-appointed independent accountant did not perform an

analysis of the value of those contingency-fee cases, which the firm possessed on the valuation date, does not warrant a different result. Although given the opportunity to do so, the husband, as the spouse claiming entitlement to marital property, did not offer any evidence to show that the value of those cases exceeded the firm's liabilities (*see Davis v Davis*, 128 AD2d 470 [1987]). Accordingly, the husband failed to meet his burden to prove that the wife's business had any value.

## Child Support

The husband argues that the court improperly imputed a $60,000 annual income to him for child support purposes. Child support is based on a parent's ability to provide for his or her children, not necessarily the parent's current economic situation (*see* Family Ct Act § 413 [1] [a]; *Matter of Zwick v Kulhan*, 226 AD2d 734 [1996]). Since the trial court considered the credible proof—specifically, the husband's possession of both an architect's and real estate broker's license and his extensive training and experience in both fields—and rendered a decision based on the proven facts and applicable law, we find no basis to disturb its reasoned and reasonable imputation of income to the husband (*see Chervin v Chervin*, 264 AD2d 680 [1999]).

## Wife's Law License

Although at the end of his main brief and in a conclusory fashion the husband asserts that the matter must be remanded, among other reasons, to value the wife's law license, he makes no specific substantive argument which focuses on the merits of this claim. We therefore decline to consider it.

## Judicial Bias

To begin with, the husband's claim of judicial bias is unavailing, since he both failed to interpose an objection when he had an opportunity to do so, and, in the absence of a mandatory statutory basis for disqualification, he failed to demonstrate bias affecting the result (*see Schrager v New York Univ.*, 227 AD2d 189, 191 [1996]; *Melnik v Melnik*, 118 AD2d 902, 904 [1986]). Furthermore, the judge violated no controlling ethics opinion or rule (*see* Advisory Comm on Jud Ethics Op 02-06 [2002]). Moreover, not only does the credible evidence over-

whelmingly support the results, but, indeed, in some respects, the court's economic determinations are generous to the husband.

Accordingly, the judgment of the Supreme Court, New York County (Marylin Diamond, J.), entered April 4, 2000, granting the wife a divorce on the ground of cruel and inhuman treatment, and supplemental judgment of divorce, same court and Justice, entered October 19, 2001, inter alia, dividing the parties' marital property 65%-35% in the wife's favor, finding that the wife's law firm has no value, and finding the husband 50% responsible for those debts of the wife's business for which she may be held personally liable, should be affirmed, without costs.

ELLERIN, J. (concurring). I reluctantly concur in the majority result herein notwithstanding my belief that the distribution of marital assets is inequitably generous to defendant-appellant.

While the dissent predicates its rationale on the invalid agreement the parties signed some 26 years ago, this case is controlled by the laws governing equitable distribution as set forth by the Court of Appeals in *Price v Price* (69 NY2d 8 [1986]).

As has been repeatedly held, the overriding consideration in equitable distribution is the contribution each party makes to the marriage, the success of which depends "not only upon the respective financial contributions of the partners, but also on a wide range of nonremunerated services to the joint enterprise, such as homemaking, raising children and providing the emotional and moral support necessary to sustain the other spouse in coping with the vicissitudes of life outside the home" (*id.* at 14 [citations omitted]). In this case, appellant's contribution to the marriage essentially consisted of taking the children to school one day a week. Respondent, on the other hand, not only assumed almost the entire responsibility for rearing the couple's three children, but also overwhelmingly provided the financial support for the family, to the extent of 90%. She not only paid all the New York City household and child care expenses, but also contributed substantial sums to appellant's various projects, which do not appear to have resulted in any benefit to the marriage beyond appellant's own personal gratification. Moreover, the egregious conduct by the husband, detailed in the majority opinion, which amply supports the finding of cruel and inhuman treatment, is the very antithesis of the "emotional and moral support" contemplated by the Equitable Distribution Law, both in adversely affecting the wife's personal mental well-

being and in interfering with her pursuit of the professional activities that provided the financial support for the family.

Clearly, based on their respective contributions, in my opinion, an award of 20% would be overly generous to appellant, and I would so find were I considering this matter at the trial level.

Most puzzling is the dissent's reference to respondent's egregious "financial misconduct" in deciding (with her partner) to pay millions of dollars owed to the debt-plagued firm's investors instead of paying payroll taxes. Respondent was trying to save the firm from dissolution, and subsequently negotiated settlements in satisfaction of the firm's debt with the taxing authorities, albeit with the exception of the IRS. In any event, as the majority points out, had the firm paid the payroll taxes, it still would have owed its investors and still would have had significant debt, and the financial consequences for the family would have been virtually the same. More significantly, notwithstanding the dissent's harsh condemnation of respondent's attempt to save the firm, it is difficult to understand by what rationale any claim that the government might have for "tax-avoidance improprieties" should inure to the benefit of appellant.

SAXE, J. (dissenting in part). In litigated divorces, the parties often express numerous grievances and disappointments concerning the conduct of the other spouse, which may range from uncooperative and thoughtless, to cruel and shameful, to criminal. Seldom do the combatants mention good or happy times, positive experiences or past loving, caring conduct. As a result, the court is often left with a one-sided, skewed negative image of one or both parties. But, regardless of the trial court's disagreement with or disapproval of an individual's approach to the marriage or treatment of his or her spouse, unless that individual's conduct rises to the level of egregious marital fault or serious economic misconduct, in a long-term marriage the Equitable Distribution Law generally requires an essentially even distribution of the marital estate (*see e.g. Granade-Bastuck v Bastuck*, 249 AD2d 444 [1998]).

Here, the conduct of the defendant husband did not rise to the level of egregious fault or serious economic misconduct. More importantly, the limited nature of his participation in the family's day-to-day life, for which the trial court found him blameworthy, was primarily due to his separate residence in another county, which was precisely in keeping with the framework

of the marriage, specifically agreed upon by the parties, in writing, prior to the marriage. Within their written agreement, in which both parties stated that they intended and wanted to live primarily in separate households in separate counties, is the implicit assumption that neither of them should be penalized for arranging their lives in accordance with that agreement.

With this background in mind, I disagree with the highly skewed equitable distribution award directed by the trial court and approved by the majority here, in which the defendant husband received just 35% of the marital assets, while being saddled with half the wife's enormous personal debt liability. In the parties' unique circumstances, defendant's conduct does not warrant such a disproportionate, punitive award, especially when plaintiff's own serious financial improprieties are taken into account. In my view, a 55%-45% distribution takes into account the agreed-upon structure of the parties' marriage while recognizing the wife's greater burden in caring for the family.

I disagree even more strongly with the concurring Justice's suggestion that the distributive proportion was not punitive enough, and should be 80/20. But, a debate of just how punitive the distributive award ought to be is not necessary, because this is not a situation where a punitive distributive award is warranted. Ultimately, determination of the proper and reasonable equitable distribution award must be based upon a thoughtful weighing of the complete factual picture within the legal framework of the Equitable Distribution Law, rather than by suggesting, or averaging, a variety of alternative percentages.

Before proceeding to discuss the reasoning behind my conclusions, I note that I agree with the majority's affirmance of the judgment of divorce itself, since plaintiff wife's testimony established grounds for divorce based upon cruel and inhuman treatment (Domestic Relations Law § 170 [1]).

## Facts

The plaintiff wife, "K," and defendant husband, "B,"[1] were married on October 8, 1978. K is an attorney who, prior to the marriage, was employed as an associate at the firm of Skadden

---

**1.** The trial court's adoption of this anonymous form of caption and reference to the parties was employed for the protection of plaintiff's law firm, many of whose clients may not know the financial straits it is in. It is notable that inasmuch as the husband was awarded no interest in the firm, the anonymity benefits only the wife.

Arps. B is an architect and real estate broker who also buys and renovates properties. During the marriage they had three children, born in 1982, 1984 and 1989. This divorce action was commenced after almost 20 years of marriage, in June 1998.

It is undisputed that one week prior to the marriage, the parties agreed, in writing, to an unusual marital living arrangement, by which each of them would maintain his or her own residence, the wife's in New York City, the husband's in Putnam County, New York, and would spend weekends together in one or the other location according to an agreed-on schedule, depending on the season. It also contained financial provisions, including one providing for an equal division of marital property upon divorce. Despite limits to its enforceability, this agreement should have been admitted into evidence inasmuch as it contained the fabric and the prism through which their marital expectations could be understood and evaluated.

Because the document predated the Equitable Distribution Law, having been executed on October 2, 1978, the absence of the formalities specified by Domestic Relations Law § 236 (B) (3) does *not* invalidate it (*see Bloomfield v Bloomfield*, 97 NY2d 188, 194 [2001]). Under the law as it stood at the time the agreement was executed, it was largely valid.[2] Had the husband properly and timely proceeded to seek enforcement of its property-division provision, he would have been entitled to rely on that term of the agreement. It was his failure to raise the existence of the agreement until the date he took the stand at the trial of the financial issues that precluded him from seeking enforcement of its financial provisions. Nevertheless, the agreement still had evidentiary value because it accurately reflected *both* parties' understanding of the nature of their marriage and their responsibilities toward one another. In any event, it is undisputed that the parties agreed to their nontraditional arrangement of maintaining separate households, even in the event that they had children, and they lived in accordance with this agreement for many years, even after they had children.

At about the time of the parties' marriage, K left her position at Skadden Arps in order to start a new type of law practice. In the wake of the United States Supreme Court decision allowing lawyers to advertise (*see Bates v State Bar of Ariz.*, 433 US 350

---

**2.** Certain provisions of the agreement, such as those promising particular sexual acts as well as specifying their frequency, are unenforceable, but this would not invalidate the entire contract (*see generally* 22 NY Jur 2d, Contracts § 211).

[1977]), and after extensive discussion with Steve M., one of the partners of a California law firm (J&M), K decided to join J&M and open east coast offices, with the understanding that the firm would begin aggressively marketing itself as a provider of general legal services to ordinary people. Initially, she obtained investors and opened up 11 firm offices in New York.

J&M expanded aggressively at first, continuing to open additional branch offices during the 1980s. In 1983 the firm had 15 to 16 branch offices in New York, and K became a full one-third partner in the firm. However, K and her law partner Steve M., who served as the firm's chief financial officer, ultimately found that the branch offices generated insufficient revenue, and they began to retreat from providing general legal services and to focus the firm's practice on personal injury cases, in an attempt to become profitable. By the early 1990s they were struggling to keep the firm afloat economically.

As between the parties, the pattern of conduct that had evolved during the first years of their marriage regarding their responsibility for expenditures was that K paid for her expenses in New York, and B paid for his expenses in Putnam. Then, as K became a partner at J&M and began to earn a greater income from the firm, and especially after 1989 when the real estate market collapsed, along with B's real estate development partnership, B regularly sought financial contributions from K toward his "projects," the properties in which he invested and developed for resale. Additionally, the couple had purchased a Vermont farm in 1986, on which B raised cattle; while this property sometimes earned a small profit, in some years it engendered losses of many thousands of dollars, and funds from K were required for its upkeep.

By the late 1980s, K was providing 90% of the financial support for the family. For his part, B contributed toward the costs of his projects to the extent he was able, with his contribution to the rest of the family's expenses limited to periodic payments of a relatively small portion of the three children's private school tuition.

Even after they had children, the couple continued to maintain their separate residences, and the children resided with the wife in Manhattan. At first, B came to visit one weekday in addition to their scheduled weekend visits. But, after K gave birth to their second child, B acceded to her request that he come in and stay over in Manhattan for two weeknights. By the mid-1990s, K asked B to come into the city early enough

on Tuesdays so as to participate in the children's evening activities, but he did not arrive until 8:30 or 9:30 P.M., which she felt was too late to be helpful. Similarly, he did not visit on weekends any earlier than Saturday night, explaining that he had to work. K asserted that once the children were older, they no longer wanted to spend weekends in the Putnam County home, so she and the children stayed in Manhattan.

Sometime around 1989, when the couple's third child was born, K moved to a bigger rental apartment in the same building, over the husband's objections that they could not afford the increase in rent. K emphasized that she had spent years accommodating his wishes and that, in fact, she paid for almost everything, and she made the move despite his disapproval, causing him to became furious. Indeed, it was around this time that, according to the wife's testimony, B became sullen, angry and withdrawn, treating her rudely and discourteously, refusing to discuss things and calling her stupid.

The firm's problems with debt intensified in the early 1990s. K acknowledged that in 1991 or 1992, faced with investors demanding repayment, she and her partner Steve M. decided to use "a couple of million dollars" that would normally have been used for payroll taxes, and pay back investors to whom they owed money. There was no explanation provided as to how they intended to resolve the tax debt.

In October 1995, in response to steps taken by Steve M. and K which allegedly had a negative impact on the firm's west coast offices, Len J., the J&M partner in California, sued Steve M. and K, alleging various business torts. In December 1995 they settled the claim by agreeing to buy out Len J.'s interest in the firm by paying him $1.5 million over a period of 10 years, while leaving him with a 1% limited partnership interest and certain rights to the firm's name.

Also in 1995, the firm adopted a new limited liability partnership structure in an attempt to prevent further losses to J&M for expenses attributable to the branch offices.

Then, in April 1996, Steve M. was killed in an automobile accident, and K became solely responsible for all the firm's financial woes. She discovered that the firm had substantial additional tax liabilities, and that its debts came to approximately $30-40 million. In 1996, after Steve M. died, the New York State taxing authority placed a $700,000 lien on both J&M and on the parties' house in Cold Spring, New York, based upon the firm's nonpayment of payroll taxes.

K began to concentrate on saving the firm from being put out of business. She began negotiations with the many taxing authorities, federal, state and local, to which the firm owed money; for most of these debts, she successfully negotiated a pay-out deal providing that a partial payment, over time, would satisfy the debt. However, negotiations with the IRS were not as successful; at the time of trial, no such settlement had been reached with the federal authorities. The claimed debt to the IRS at that time was over $4 million.

K also began to search for, and after commencement of this action she ultimately found, another firm that could take over the legal practice of processing J&M's personal injury cases, in exchange for two thirds of the proceeds from those cases.

Under the enormous pressure caused by the mounting evidence of overwhelming debt and her responsibility for arriving at a resolution without dissolving the firm, K complained to B that she was "drowning" and needed his help and support. His reply was unsympathetic: he said he had his own problems and needed money from her for his projects, which properties he refused to sell because they would eventually be worth a lot more money; he also blamed her for causing the problems by doing such an incompetent job at J&M.

In 1996, at B's request, K gave him a final check for $100,000, from her savings. After that, she was unable any longer to contribute toward his projects, given her own precarious financial situation. She subsequently discovered that he had liquidated approximately $130,000 worth of their mutual funds, his explanation being that he needed to spend it on different projects for the farm and on part of the children's school tuition. Also in 1997, K discovered that B had cashed a $35,000 tax refund from their 1995 joint tax return without mentioning it to her. He explained that he used the money to pay expenses on the farm. The husband also sold other items in order to obtain the funds he continued to need in order to maintain his properties and projects; some of these items were marital property, some he claimed were his separate property.

Notably, K, too, took possession of marital property: specifically, she acknowledged having cashed $135,627 of jointly owned stock to pay off J&M investors after Steve M. died; although she referred to (and treated) the stock as her own, she did not demonstrate that it was her separate property.

In concluding that defendant husband should receive only 35% of the marital estate, the trial court concluded that B had

failed to make a significant contribution to the marriage, and remarked that the marriage was not the full partnership contemplated under the Equitable Distribution Law (citing *Price v Price*, 69 NY2d 8, 13-16 [1986]). The court also held that he had committed financial misconduct, such as his unilateral taking of marital funds and property, and his filing of an "innocent spouse" tax relief form with the IRS.

## Discussion

This case is highly unusual. Normally, in distributing marital assets the court need only consider and judge parties' conduct in the framework of the Equitable Distribution Law (Domestic Relations Law § 236 [B]), particularly the factors listed in section 236 (B) (5) (d). Here, however, defendant's conduct must also be viewed in the context of the couple's prenuptial agreement, in which they set forth their mutual understanding of the unique nature of the relationship they both sought. The marriage envisioned by these two highly educated, sophisticated individuals, one of whom was an attorney, involved their maintaining wholly separate homes and separate weekday lives.

Viewed in this light, defendant's failure to take part in family life, even when the crisis in plaintiff's life would have made his participation invaluable, cannot serve as the basis for the 65/35 split of marital assets directed by the trial court. Nor is the concept of misconduct applicable here to justify a skewed distribution of the marital estate.

## Financial Misconduct

It is well established that marital fault, that is, misconduct on the part of one spouse toward the other, generally does not warrant a punitive distribution of marital property, unless "the marital misconduct is so egregious or uncivilized as to bespeak of a blatant disregard of the marital relationship—misconduct that 'shocks the conscience' of the court thereby compelling it to invoke its equitable power to do justice between the parties" (*see Blickstein v Blickstein*, 99 AD2d 287, 292, 293 [1984], *appeal dismissed* 62 NY2d 802 [1984]). The rule enunciated in *Blickstein* precludes the punitive disproportionate distribution of marital assets based upon such misconduct as adultery, alcoholism, verbal abuse and even physical attacks (*see McCann*

*v McCann*, 156 Misc 2d 540, 547 [1993]), at least barring the type of vicious assault discussed in *Havell v Islam* (301 AD2d 339 [2002], *lv denied* 100 NY2d 505 [2003]). No such shocking conduct is established here, nor did the trial court find such egregious marital fault. Plaintiff's testimony regarding conduct which plaintiff denominated "marital rape" was relied upon in part to establish grounds for divorce, but, properly, was *not* relied upon to support an uneven distribution of marital property.

In addition to "egregious" marital fault, a party's financial misconduct may serve as grounds for adjusting the distribution of the marital estate, where it falls within the category of "wasteful dissipation of assets" under Domestic Relations Law § 236 (B) (5) (d) (11) (*see Blickstein, supra*; *Havell v Islam*, 301 AD2d at 344; *Southwick v Southwick*, 202 AD2d 996 [1994]). However, defendant's conduct toward plaintiff and toward their assets, although perhaps blameworthy in some respects, does not rise to the level of wasteful dissipation of assets contemplated by the statute, and did not warrant the punitively disproportionate award made by the trial court.

The financial misconduct by defendant upon which the trial court relied in so unevenly dividing the marital estate consisted of (1) defendant's liquidation of the parties' brokerage and money market accounts, valued at approximately $135,000; (2) his recovery of the cash surrender value of life insurance policies, equaling approximately $60,000; (3) his taking sole possession of a joint tax refund of $35,000; (4) his selling of artwork and antiques at below-market values and use of the funds; and (5) his filing of an "innocent spouse" tax relief form with the IRS in an effort to prevent the enormous tax liability of plaintiff's law firm to be visited upon him.

The trial court termed defendant's cited conduct a dissipation of marital assets. However, the term "dissipation" is not generally applied to a spouse's use of marital funds to pay for the upkeep of marital property that the other spouse would prefer to be sold. Rather, the term is generally used to characterize such types of wasteful expenditures as gambling, the purposeful destruction of assets or a business, secreting assets, or squandering large amounts of money on completely separate concerns. For instance, in *Maharam v Maharam* (245 AD2d 94 [1997]), this Court increased an equitable distribution award in the wife's favor from 55% to 65%, where the defendant husband "secreted [marital] assets in a foreign bank account" and

"squandered sizable sums on luxury items and in admitted adulterous affairs" (*id.* at 95). In *Davis v Davis* (175 AD2d 45, 46 [1991]), when the defendant husband wanted to close the family-owned business, and the plaintiff wife assumed the full responsibility of running it, the defendant husband affirmatively sought to frustrate her efforts by attempting to dissuade clients from utilizing the company's services. These actions, along with the husband's transfers of funds without fair consideration to third parties, were found to support the court's 60%-40% distribution of the marital estate in the wife's favor (*id.* at 48). Interestingly, while in *Contino v Contino* (140 AD2d 662 [1988]) the Second Department remarked that secreting assets supports a finding of economic fault, such misconduct did not prompt the Court to change the proportions in which the marital estate was divided. Rather, it awarded to the defendant the amount secreted by the plaintiff, then divided the remainder of the estate evenly (*id.* at 662-663).

When marital funds are used in the maintenance and upkeep of marital property, as the funds in question were used by defendant, those expenditures simply do not fall into the same category as the foregoing dissipations of assets. The parties may have disagreed as to whether they should continue to use marital funds to pay for the upkeep of property rather than simply sell it. However, even if one party's unilateral decision to continue to pay this type of upkeep cost is a bad idea, it simply does not rise to the level of the type of financial misconduct that warrants a punitive, skewed distribution of the entire marital estate.

B's continued demands for financial support for his projects when K had no money left to give, and had more pressing demands for the funds to which she had access, were certainly self-centered and immature. But, the critical point here is that B's use of marital funds for the maintenance of properties and projects was not an improper seizing of family funds for his private use, but was in keeping with his approach throughout the marriage to earning money. He was never employed in a manner that resulted in a weekly paycheck, but rather, sought to periodically turn a large profit, an approach which requires infusions of cash for upkeep up to the point of ultimate sale.

Additionally, it is far from clear that K's use of $135,627 of jointly owned stock to pay off J&M investors after Steve M. died was any more useful or valuable to the family's economic well-being than B's use of marital funds for his ventures.

It is worth noting that in the divorce arena, where a fund of support available during the marriage has dried up, it is an everyday occurrence for one spouse to unilaterally take possession of funds that properly belong equally to both. These steps may be inadvisable, and may warrant charging the party who took marital funds with a preliminary distribution to him of the funds lost by that decision. Such an adjustment, or its equivalent, is far less drastic, and more appropriate, than a punitive alteration of the proportions in which the entire marital estate is distributed.

Another fact which the trial court considered as financial misconduct was B's filing with the IRS for "innocent spouse" tax relief. The court asserted that this constituted an attempt to sabotage the firm's settlement with the IRS, based upon the judge's conclusion that B could not have been viewed as potentially liable for the firm's tax liability. However, inasmuch as a tax lien had already been placed upon B's home in Cold Spring, New York, and he was discovering that his wife's law firm owed millions more in unpaid taxes which could, presumably, result in liens on more of the parties' assets, it was entirely reasonable for him to conclude that he might have further liabilities imposed on him for other tax debts. Filing for "innocent spouse" tax relief presumably appeared to B as a way he might protect such assets as he possessed from being foreclosed upon due to the debts of his wife's law firm. While the filing may have put the firm at an additional disadvantage with the IRS, it simply is not a proper basis for a finding of financial misconduct and a disproportionate distribution of the marital estate.

Finally, but perhaps most importantly, K committed financial misconduct of her own, and hers was more egregious than B's, in that it was more extensive and farther reaching. As a result of the decision not to pay millions of dollars in payroll taxes, in order to pay off other debts of the firm, K (and her partner) injured the firm's employees and had the effect of making the government an unwilling creditor of the firm. And, every deal she made with a state or municipal government to settle the firm's tax debt by making part payment placed an extra financial burden on other taxpayers.

Seen in this light, defendant's taking and use of funds that were at least partially his, seems, even if inadvisable, far from shocking. The relatively limited extent to which B failed to accurately disclose assets or income appears minuscule in

comparison to K's tax-avoidance improprieties, which are not, as the concurring Justice would have it, irrelevant to a determination of her husband's share of the marital estate. Equitable distribution must be, by definition, equitable. K's misconduct amounted to a misuse of marital property, and her choice of continuing to sink the firm deeper in debt, rather than close it down, ultimately saddled both herself and B with marital debt of millions of dollars.

My colleague, in her concurring opinion, questions why K's tax-avoidance improprieties should inure to B's benefit. My point, however, is that the conduct which the trial court deemed financial misconduct on B's part is not only insignificant in itself, but that relative to K's conduct, *which saddled B with millions of dollars in liabilities,* it is nonexistent.

All in all, the claim of financial misconduct on B's part does not warrant an uneven distribution of marital assets.

## Significant Contribution

The trial court, and my colleagues here, also emphasize that an uneven distribution of the marital estate is justified based upon the parties' uneven contributions to the marriage and the family. In this unique case, however, this factor alone is insufficient to justify the clearly punitive, skewed 65/35 distribution.

Normally, an approximately equal distribution of the marital estate is generally warranted "in a marriage of long duration, [where] both parties have made significant contributions to the marriage" (*Granade-Bastuck v Bastuck*, 249 AD2d at 445, citing *Marcus v Marcus*, 135 AD2d 216 [1988] [subsequently revised and republished at 137 AD2d 131 (1988)]). Indeed, new bills currently under consideration in the State Senate (S 3740) and State Assembly (A 7867), if enacted, would create a statutory *presumption* that marital property should be evenly distributed (*see* www.senate.state.ny.us; www.assembly.state.ny.us).

While the lack of "significant contributions" by one spouse may possibly warrant some adjustment, we should not assume that such a "contribution" requires either earning money or raising children. There are many kinds of couples and many types of marital arrangements. There are couples in which one provides the financial support, and the other appears to spend full time maintaining a youthful, attractive, and fashionable appearance, and socializing. Whatever a couple's mutual understanding is as to their respective roles in the marriage, we

should not second guess them by negating the "contribution" of the nonearning spouse who is living completely in accordance with the other spouse's wishes and the couple's implicit or explicit arrangement.

Here, the couple's explicit mutual arrangement was that B would remain in the Cold Spring area and continue to purchase and develop properties, with the expectation that at least some of these projects would ultimately result in a substantial profit (indeed, one year B earned almost $500,000), while K would remain in Manhattan with the intent and hope of achieving great financial and professional success at a widely renowned law firm. Both of them lived in accordance with that plan. Even when the couple had children, as they had always intended, *neither* of them contemplated altering their lives so the children would have both parents around on a daily basis. Given that K firmly established herself and the children's lives in Manhattan under that plan, B's decision to continue living according to the couple's agreed-upon pattern, instead of giving up his established life to assist K with hers, should not affect the proportions in which the marital estate is distributed.

It appears that both K and the trial court believed that B should have sold properties and used the funds to contribute to the family's expenses, moved to Manhattan and spent more time with K and the children, and generally been a source of emotional support through the law firm's financial crisis. But, it is unfair to penalize B financially, in the context of a divorce, for failing to sufficiently contribute to the marriage because he did not uproot his life to relocate to Manhattan, or otherwise spend the quantity of time with his family there as would have amounted to relocating. He merely continued to attempt to earn income from developing properties, as he had done successfully earlier in the marriage, *and as the couple had agreed he would do*, and his failure to earn profits during this critical period did not warrant punishing him for making the attempt. Nor should B's relative lack of financial success during the time period at issue justify K's, or the court's, expectation that he would completely alter his life because he was the spouse earning less.

Essentially, the trial court placed undue blame on B's continued maintenance of his life in Cold Spring while his wife lived with the children in Manhattan, and on his failure to respond to her needs. *The court should have taken into account, rather than rejecting out of hand, the established fact that the parties agreed to an "unconventional" marriage in which the*

*spouses would reside apart, even in the event they had children, and it should not have so severely punished defendant for conduct that both parties had defined as the foundation of the marriage.* The wife's indisputably greater contributions to the children's rearing notwithstanding, the nature of the marriage was exactly that which the parties planned for. While a spouse's failure to be present for the day-to-day activities of family life might in other circumstances warrant an uneven distribution of assets, here the couple's fundamental agreement as to how they would live precluded punishing defendant for living in accordance with their understanding.

The blame that K placed on B for failing to be sufficiently helpful to her is understandable. Rearing children is difficult in the best of circumstances, and when a parent is under enormous stress, and her partner is there only infrequently, it may come close to being impossible. Indeed, dealing with such severe financial pressures is extremely stressful even without children, and a married person would be expected to look to her spouse at such a time for emotional, if not financial, support. Nevertheless, in view of how the couple defined their marriage, and the choices *they both* made along the way, B's failure to provide K with the emotional and financial support she desired does not warrant limiting him to a 35% share of the marital assets.

The majority writer employs lofty rhetoric concerning the wisdom of the Equitable Distribution Law. I agree that this law wisely leaves open to the courts the determination of exactly what manner of distribution is most equitable, considering all relevant facts, including the couple's respective contributions to the family as a whole. However, I believe that the majority is wrong in minimizing and ignoring the existence of the couple's agreed-upon approach to their marriage.

Because these two people, together, agreed that their unique marriage would entail maintaining separate households, and then proceeded to live in accordance with that agreement, B's absence from the day-to-day household should not in itself serve as a factor which results in the diminution of his share of the marital estate. The majority criticizes as indefensible B's continued reliance on the agreement to maintain his lifestyle, but K also made the choice to continue maintaining her household in Manhattan, apart from B.

This is not to say we should ignore the fact that K shouldered most of the burden of raising the family; that fact is highly relevant. We simply should not, overtly or covertly, penalize B for

doing what *both* spouses did: to live in accordance with their marital arrangement.

Furthermore, while courts often uphold a reduction in a spouse's distributive share of *particular assets* to which that spouse made only minimal contributions (*see e.g. Arvantides v Arvantides*, 64 NY2d 1033 [1985]; *Orofino v Orofino*, 215 AD2d 997 [1995], *lv denied* 86 NY2d 706 [1995]), here the court even reduced the husband's distributive share of those assets for which he had been primarily responsible. This overall 65-35 proportion, applicable to each asset in the marital estate, was clearly not based upon B's contribution to each of those assets, but rather, amounted to punishment for what the court viewed as misconduct.

The punitive nature of the court's equitable distribution award here is made even more egregious by the provision burdening B with 50% of any personal liability ultimately assumed by K for the law firm's debts, while at the same time finding that the wife's law firm has no value. So, B, having had no part in the decision to incur millions in tax liabilities, is burdened with that debt, while he receives no countervailing benefit from the ongoing payments the firm receives from the many hundreds of personal injury cases undertaken during the marriage which were referred to be handled by another firm, which payments are the source of K's yearly draw. While the only expert who was able to provide a valuation for the firm concluded that for purposes of valuation of the firm, this source of funds could not be valued meaningfully, in practice this award burdens B disproportionately with the firm's debts while giving him no share of the actual value K receives from marital property. It is especially inequitable to severely skew the distribution of the rest of the marital estate while B is also being so disproportionately burdened.

In view of the foregoing, I disagree with the punitive 65/35 split of assets. In recognition of K's substantially single-handed shouldering of the burdens of her family, I would modify the equitable distribution award to reflect a 55%-45% distribution of the assets.

## Bias

Finally, although it is the foregoing considerations that require an adjustment of the equitable distribution award, rather than defendant's claims of bias, in one respect there is

some credence to the claim. The contribution by the wife's attorney to the trial judge's re-election campaign fund, during the course of the litigation, serves to create the type of impression which our ethical rules seek to discourage (*see* NY St Bar Assn Comm on Prof Ethics Op 289 [A] [3] [1973]). We may presume that the trial judge had no knowledge of the contribution, since the applicable rules require that contributions be made not to the person but to the campaign fund (Code of Professional Responsibility DR 7-110 [22 NYCRR 1200.41]), and the person in charge of the campaign fund must not disclose to the candidate the identities of contributors to the fund (*see* NY St Bar Assn Comm on Prof Ethics Op 289 [A] [4] [1973]; Assn of Bar of City of NY Comm on Professional and Judicial Ethics Advisory Op 882 [1973]). Nevertheless, this unfortunate circumstance only adds to the impression that the trial court was excessively critical of the husband and insufficiently critical of the wife.

BUCKLEY, P.J., and ELLERIN, J., concur with MARLOW, J.; ELLERIN, J., concurs in a separate opinion; SAXE and GONZALEZ, JJ., dissent in part in a separate opinion by SAXE, J.

Judgment, Supreme Court, New York County, entered April 4, 2000, and supplemental judgment of divorce, same court, entered October 19, 2001, affirmed, without costs.